**CITIES SERVICE GAS COMPANY**

v.

**The UNITED STATES.**

**No. 40–73.**

United States Court of Claims.

July 14, 1978.

---

See also 500 F.2d 448, 205 Ct.Cl. 16.

Melvin Richter, Washington, D. C., attorney of record, for plaintiff. Alfred O. Holl, Daniel R. Hopkins, Oklahoma City, Okl., and Littman, Richter, Wright & Talisman, Washington, D. C., of counsel.

John W. Showalter, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before SKELTON, Senior Judge, and NICHOLS and KUNZIG, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Lloyd Fletcher, filed September 29, 1977, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, it is concluded as a matter of law that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of such recovery to be determined in further proceedings pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

### FLETCHER, Trial Judge:

■ The plaintiff Cities Service Gas Company (Cities) is an interstate natural gas company engaged in the business of purchasing, transporting, and selling natural gas in the territory traversed by its pipeline system. Cities' sales to distributor companies or municipalities which distribute and resell the gas to others are subject to rate regulation by the Federal Power Commission (FPC) under the Natural Gas Act, 15 U.S.C. § 717. Cities also makes direct sales for consumption to selected customers located at or near its pipeline system. These direct sales are not subject to FPC rate regulation.[1] Cities' pipeline system consists of some 8,300 miles of pipeline over a five-state area, Kansas, Missouri, Oklahoma, Nebraska, and Texas, and most gas that is handled through this pipeline system originates from sources in southwest Kansas, north and south central portions of Oklahoma, the Oklahoma Panhandle, and is taken northeastward to various points of delivery along the pipeline system.

Since 1928, Cities has been making direct sales of natural gas to the Department of the Army on a firm basis (i. e., without interruption) for use in its facilities (exclusive of its Disciplinary Barracks) at Fort Leavenworth, Kansas. Also, since 1940, Cities has been making direct sales of interruptible gas for use at the Army's Disciplinary Barracks located at Fort Leavenworth. For many years, both of these firm and interruptible sales were made pursuant to express written contracts between the parties and until September 1963, both parties considered that the rates for the gas sold under both contracts were not subject to regulation by the FPC because they were sales for direct consumption and use by the Army. However, in September 1963, defendant instituted proceedings before the FPC (Dkt. No. RP64–17) claiming that the FPC should treat the sales as sales for resale and hence subject to its rate jurisdiction. This proceeding culminated in the issuance of FPC Opinion No. 489, 35 FPC 571 (1966), in which it held, *inter alia*, that "[t]he disciplinary Barracks sale is not a jurisdictional sale for resale," but rather "a non-jurisdictional direct sale" (35 FPC at 572–3). Further, it held that while the Army was in fact reselling a small portion of the Fort Leavenworth gas, the commingling of the gas which was resold with the remainder of the gas did not convert the entire sale to a jurisdictional sale for resale (35 FPC at 575). Instead, it noted that:

> Since it seems clear . . . that prior to the initiation of the Army's complaint herein, the Commission had not consciously authorized any sale for resale, the entire sale by Cities to the Army up to the time appropriate relief procedures, if necessary, are prescribed, must be treated as a sale for the Army's own use.

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed September 29, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. Direct sales, as well as sales for resale, however, are subject to FPC regulation with regard to the initiation, curtailment, quality, quantity, and termination of service, i. e., certificate jurisdiction. *See, e. g., F.P.C. v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

Thereafter, upon the parties' inability to negotiate satisfactory new agreements, Cities, on September 9, 1970, notified the Army of its intent to terminate the then existing contracts, effective March 15, 1971, as permitted by these contracts. Subsequently, on December 18, 1970, Cities further advised the Army that it was willing to deliver gas to the Army for its own consumption after March 15, 1971, but that in the absence of written agreements and until further notice it expected to be paid the reasonable price of 50 cents per thousand cubic feet (Mcf) for firm gas and 30 cents per Mcf for interruptible gas. The Army's response was that while it "had no intention whatsoever to permit or consent to any reduction or abandonment of service by your company at Fort Leavenworth," it disagreed with the price claimed by Cities and would pay no more than the FPC tariff rates.

The parties have never been able to reach an agreement on the price for the gas although, as stated, Cities has continued to deliver gas to the Army at the Disciplinary Barracks (interruptible) and Fort Leavenworth (firm). Also, at various times throughout the periods involved, Cities has notified the Army by letters that, in keeping with rate increases to other direct sales customers, the reasonable market price for gas furnished the Army was increasing as specified in such letters.

The parties have stipulated as to the volumes of firm and interruptible gas delivered by Cities during each of the periods involved as well as to the amounts paid by the Army.[2] Based on the volumes and amounts thus stipulated, the recovery here being claimed by Cities aggregates $447,442.20 as shown in the following table:

2. Cities accepted the payments tendered by the Army as partial payments only, reserving the right to claim the additional amount invoiced when the dispute as to the amount due was resolved.

| Firm | | | |
|---|---|---|---|
| Period | Volumes (Mcf) | Price (cents) | Total ($) |
| 3-16-71 to 10-22-73 | 1,928,401 | 50.0 | 964,200.50 |
| 10-23-73 to 5-22-74 | 610,610 | 57.0 | 348,047.70 |
| 5-23-74 to 1-22-75 | 440,972 | 66.5 | 293,246.38 |
| 1-23-75 to 2-22-76 | 836,665 | 73.0 | 610,765.45 |
| | | | 2,216,260.03 |
| Amounts paid by Army | | | 1,781,035.91 |

Difference Claimed by Cities        $435,224.12

| Interruptible | | | |
|---|---|---|---|
| Period | Volumes (Mcf) | Price (cents) | Total ($) |
| 3-16-71 to 10-22-73 | 330,190 | 30.0 | 99,057.00 |
| 10-23-73 to 5-22-74 | 91,176 | 38.5 | 35,102.76 |
| 5-23-74 to 1-22-75 | 52,914 | 45.8 | 24,236.61 |
| 1-23-75 to 2-22-76 | 43,976 | 52.3 | 59,609.48 |
| | | | 218,005.72 |
| Amounts paid by Army | | | 205,787.64 |

Difference Claimed by Cities        $ 12,218.08

Total Recovery Claimed Herein by Cities     $447,442.20

On March 1, 1974, the court had issued an order suspending this proceeding for the purpose of giving the Army an opportunity to file an application with the FPC directing Cities to sell and deliver gas for resale to it under Section 7(a) of the Natural Gas Act. However, on Cities' application for rehearing, the court vacated that suspension order, and instead granted Cities' motion for partial summary judgment. *Cities Service Gas Company v. United States*, 500 F.2d 448, 205 Ct.Cl. 16 (1974).

In addition to summarizing the foregoing history and pointing out that the decision in the Section 7(a) proceeding "applies *prospectively only*", (emphasis in original), 500 F.2d at 450, 205 Ct.Cl. at 20, the court held that there existed a contract implied in fact between Cities and the Army with respect to the gas delivered by Cities to the Army for Fort Leavenworth since the termination of the written contract on March 15, 1971, and that Cities was entitled to recover on a *quantum meruit* basis for all such gas at least until the issuance of a decision by FPC in the Section 7(a) proceeding.[3] Further, the court rejected the defendant's claim

3. The proceeding before the Commission on the Army's application, under Section 7(a) is pending before the Administrative Law Judge. Briefs have been submitted to the Judge and the matter is awaiting the issuance of his Initial Decision.

that its payment of Cities' jurisdictional rates discharged its obligation to pay *quantum meruit* due under its implied contract with Cities. The court summarized its holding as follows:

In summary, we hold that all of the gas heretofore sold by the plaintiff at Fort Leavenworth must be treated as direct sales for the use of the Army, in accordance with FPC opinion No. 489; that such sales are not jurisdictional sales and are not subject to FPC jurisdiction as to rates, and are not governed by the jurisdictional tariffs of the plaintiff on file with the FPC. Furthermore, we conclude that plaintiff is entitled to recover on an implied contract in fact the value of all such gas on a *quantum meruit* basis. 500 F.2d 457, 205 Ct.Cl. 33.

Accordingly, the court remanded the case to the trial judge to determine the amount of plaintiff's recovery on a *quantum meruit* basis under Rule 131(c).

From the foregoing it is at once apparent that defendant's liability to plaintiff has been established, and the only issue now for determination by the Trial Division is the amount of plaintiff's recovery on a *quantum meruit* basis. In this connection, the court in its opinion herein has instructed the trial judge as follows at 500 F.2d 456, 205 Ct.Cl. 32;

Finally, the defendant says that in any event it has paid just and reasonable rates to the plaintiff for the gas it has received, because it has paid the jurisdictional tariff rates of the plaintiff on file with the FPC, and that such rates would not be on file and approved by the FPC if they were not just and reasonable. This does not necessarily follow. While we express no opinion as to the reasonable value of the gas sold by plaintiff to the Army, we point out that the determination by the FPC of just and reasonable rates for jurisdictional sales by natural gas pipeline companies is based on costs to the companies and other items so as to allow them a reasonable rate of return on their investments. [citing cases]

On the other hand, value determined on a *quantum meruit* basis under an implied in fact contract is not based on costs nor a reasonable return on investment of the seller, but on the *reasonable value in the marketplace of the property sold.* [Citing cases and other authorities] [Emphasis supplied].

In proceeding with the incredibly difficult task of proving their respective contentions regarding the "reasonable value in the marketplace" of natural gas in the Fort Leavenworth area, counsel for the parties have presented the testimony of competent and knowledgeable expert witnesses. Their lengthy testimonial analyses have clearly shown the "eely" and bewitching character of the word "value." *See Commissioner of Internal Revenue v. Marshall*, 125 F.2d 943, 946 (2d Cir. 1942). Their divergent viewpoints are perhaps to be expected since "market value" is at best an approximation which can almost never be ascertained with mathematical accuracy.[4] As Randolph E. Paul has said:

Valuation is neither crystal gazing nor geometry, but a serious hard business with economic and social implications of vast significance. The complexities of the task, if it be done in the right way, are almost past belief. The law of valuation cannot be put into a straight-jacket; it involves, as do few tasks in the law, a delicately poised judgment which will reduce to their proper place a host of cross influences and deflecting forces. Principles of valuation, like other principles in the law, are "complex bundles," and no theory may be wholly trusted, for it may be out of touch with reality. A conventional attitude is as dangerous as a radical approach. A thousand shades of contradiction must be carried in the mind at one time. One must look in many directions at the same time. One must avoid a microscopic attitude, yet a host of

---

4. One is tempted to call it one of Mr. Justice Cardozo's "shifting" approximations. Cardozo, *The Growth of the Law*, p. 68 (1924).

details must be balanced in the most accurate scales. Tight thinking, which allows no play to the joints of the machine, is as out of place as loose thinking in which the joints do not fit at all. There is always the subtle temptation to come, without knowing it, to a fatigue decision. There is the equally powerful temptation to come to no decision at all. But in the end a judgment involving prophecy must be risked as our salvation has to be wagered, "every year if not every day," [Holmes, J., dissenting in *Abrams v. U. S.*, 250 U.S. 616, 630 [40 S.Ct. 17, 63 L.Ed. 1173] (1919)] upon some prophecy based upon imperfect knowledge. Paul & Zimet, "Realistic Valuation," Studies in Federal Taxation, pp. 228–229, Callaghan & Co. (1937).

█ The fact, however, that a valuation reached has in it baffling elements of speculation and surmise does not mean that it should not be employed. One guess may be better than another guess, since not all guesses have in them the same element of intelligence. The realization that a considerable amount of conjecture is involved should not paralyze the function of deciding, but it should induce humility. Dogmatism is clearly out of order in a modern valuation case.

With these general observations in mind regarding the elusive phantom of "value," I proceed to the ultimate question of the weight to be ascribed to the "composite mass" of the evidence produced by the parties. *See Norfolk & Western Ry. Co. v. North Carolina*, 297 U.S. 682, 689, 56 S.Ct. 625, 80 L.Ed. 977 (1936).

In this connection, Cities presented the testimony of two witnesses. One was its manager of direct sales, Howard A. Peil, and the other was an outside expert with extensive background and experience in the marketing of natural gas and other forms of energy, Ross Cahal, Jr.

Peil testified that since 1971 Cities has sought to maintain a standard policy of charging like prices for like types of service in the same general areas. This policy was part of Cities' effort to treat each and every customer who has similar service requirements on the same basis. He believed that if Cities were to charge different prices to different customers, Cities would end up with an unmanageable hodge-podge of prices which would not only result in administrative chaos in the light of its large number of direct customers but, even more importantly, would result in discrimination among such customers, depending on their individual situation or their bargaining skills or aggressiveness. He demonstrated that in arriving at the amount of its price increases during the periods involved, Cities' management took into account numerous factors, some of the most important being the shortage of gas supplies, generally increasing costs throughout the system, and declining revenues. These and other factors do not lend themselves to precise calculations, and he described the end pricing decision as being the product of a business judgment. Other than broad generalizations regarding the adverse impact of inflation, and supply shortages, no specific effort was made by Cities to justify the price increases to its direct customers.[5]

When Cities terminated its contracts with the Army in the spring of 1971, it was charging 53.5 cents per Mcf for large volume firm service with a minimum bill of $5. At that time, also, it was charging for large volume, i. e., in excess of 10,000 Mcf per month, direct interruptible service, 53.5 cents per Mcf for the first 300 Mcf, 38.5 cents per Mcf for the next 2,700 Mcf, 34.5 cents per Mcf for the next 7,000 Mcf, and 30 cents per Mcf for the excess over 10,000 Mcf per month.

Subsequently, as the opportunity for renegotiation arose under the terms of the contracts, or the contracts had expired, Cities increased its prices for gas by 3.4 cents per Mcf as of October 23, 1972, 9.6 cents per Mcf as of October 23, 1973, 6.5 cents per Mcf as of June 23, 1974, and 18 cents per Mcf as of February 23, 1975.

5. "Of all the areas of executive decision, pricing is perhaps the most fuzzy." Oxenfeldt, *Multi-stage Approach to Pricing*, 38 Harv.Bus. Rev. 125 (1960).

Cities' prices for its direct sales in the eastern Kansas area during the periods here involved were generally as follows:

| Period | Firm | Interruptible | |
| --- | --- | --- | --- |
| | | First Block | Last Block |
| 3-71 to 10-72 | 53.5 | 53.5 | 30.0 |
| 10-72 to 10-73 | 56.9 | 56.9 | 33.4 |
| 10-73 to 6-74 | 66.5 | 66.5 | 43.0 |
| 6-74 to 2-75 | 73.0 | 73.0 | 49.0 |
| 2-75 forward | 91.0 | 91.0 | 67.5 |

Cities has been making and still makes a large volume firm sale to Goodyear Tire and Rubber Company for use as process gas in its plant located in northeastern Kansas. While, at the beginning under this contract, Goodyear paid prices similar to those which Cities is claiming from Fort Leavenworth during the period here involved, Goodyear has been paying the prices generally comparable to those set out in the above table for firm service.

Cities also makes large volume interruptible direct sales to seventeen customers in eastern Kansas. The volumes sold to these customers are comparable to the interruptible volumes delivered at Fort Leavenworth, i. e., all use in excess of 10,000 Mcf of gas per month. Although the prices which these direct customers have been paying Cities for their gas generally have been higher than those Cities is claiming for the sales here involved, each of these large volume direct customers entered into contracts with Cities for the continuation of their purchases of the gas.

Cities' expert witness, Cahal, approached the valuation problem here involved from a broader perspective. In his view, natural gas is but one form of energy among several forms which can meet the energy requirements at Fort Leavenworth. The other energy forms are No. 2 and No. 6 fuel oils, propane, and electricity. From his experience, Cahal has concluded that a reasonably accurate determination of the marketplace value for natural gas can be derived by computing a weighted average of the known prices at which the various competing forms of energy are offered.

In keeping with his valuation theory, Cahal performed three alternate computations using different combinations of energy forms. In my opinion the most reasonable and conservative of these alternative computations is the one by which Cahal arrived at a marketplace value for natural gas by considering the market values for No. 2 and No. 6 fuel oils and propane coupled with a comparison of the price of unregulated sales of natural gas throughout the general area in which Fort Leavenworth is located. The marketplace values of natural gas so determined are as follows:

| Period | Firm | Interruptible |
| --- | --- | --- |
| 1971 | | |
| Jan.-June | $ .563 | $ .375 |
| July-Dec. | $ .557 | $ .371 |
| 1972 | | |
| Jan.-June | $ .571 | $ .38 |
| July-Dec. | $ .574 | $ .382 |
| 1973 | | |
| Jan.-June | $ .625 | $ .416 |
| July-Dec. | $ .667 | $ .445 |
| 1974 | | |
| Jan.-June | $ .949 | $ .633 |
| July-Dec. | $1.001 | $ .667 |
| 1975 | | |
| Jan.-Dec. | $1.220 | $ .813 |

The values set forth in this table are somewhat higher than the prices claimed herein by Cities.

Defendant's expert witness, James Lim, took an entirely different approach which was based essentially on his view that a natural gas pipeline operation, such as Cities, constitutes an effective natural monopoly and that, accordingly, no competitive market for direct sales of natural gas can exist under such circumstances. In support of this proposition, he and another Government witness discussed at length the impracticability from a capital cost standpoint of converting the facilities at Fort Leavenworth to the use of any energy source other than natural gas.[6]

As an indication of the validity of these assumptions, defendant also produced the testimony of a number of witnesses, some of whom were either city managers or public utility officials of cities located in Kansas with residential and commercial areas

---

6. The problems and expenses involved in any such conversion of existing facilities are set forth at length in findings 41 through 46.

similar to those of Fort Leavenworth. Also, some of those witnesses were officials of companies, such as the Boeing Company, which were large-scale customers of plaintiff under direct sales contracts (and hence, unregulated) for the delivery of natural gas. Without exception these witnesses testified that the cities or companies which they represented had experienced several price increases in their direct sales contracts with Cities during the period in question. They said further that they were advised of such increases by letters from Cities at various times, that they had not been able to negotiate such proposed increases with Cities, and that the increases were proposed to them on a take-it-or-leave-it basis. However, without exception, these witnesses also testified that their city or company continued to purchase gas from Cities in preference to any possible alternative because the natural gas prices being charged by Cities were, and are, lower than those of other fuels and of locally produced gas.

In seeming despair at ever being able to determine a "market value" under such circumstances as that phrase is traditionally understood, Mr. Lim resorted to the method ordinarily adopted by the FPC in the performance of its regulatory function by using the cost to plaintiff of delivering firm and interruptible natural gas to Fort Leavenworth, including recovery of all its costs of operation, plus a reasonable return on its investment. By this method he determined the following figures to be what he felt was the reasonable value in the marketplace of natural gas delivered to Fort Leavenworth for the years 1971, 1972, 1973, and 1974.

| Year | Firm | Interruptible |
|------|------|---------------|
| 1971 | 34.16 | 21.84 |
| 1972 | 35.81 | 23.31 |
| 1973 | 36.68 | 24.92 |
| 1974 | 47.20 | 30.70 |

■ The difficulty with Mr. Lim's approach to the valuation problem here involved is obvious.[7] It obdurately persists in ignoring the court's previous instruction in this case that:

. . . value determined on a *quantum meruit* basis . . . is not based on costs nor a reasonable return on investment of the seller . . . 500 F.2d 448, 205 Ct.Cl. 32.

Since in my opinion the defendant's proof has tended to ignore this decision by the court, little weight has been assigned to the testimony of defendant's expert. To do otherwise would be an unthinkable disregard of the court's instructions to the Trial Division. Obstinate persistence in the presentation of his case by a dissatisfied litigant is not frowned upon under our system of litigation and, indeed, may even be encouraged as an aid to a just decision. Such an attitude, however, is quite properly *not* to be taken by the trier of facts on remand from the appellate body.

In its Brief, defendant justifies its valuation approach as follows:

It is defendant's position that no prices exist which can be used to establish a market price for the natural gas delivered by plaintiff since March 15, 1971, at Fort Leavenworth. The reasons for this position are: (1) there are no sales or transactions similar enough to that at Fort Leavenworth; (2) and, even assuming similarity, any such transactions have not taken place in a sufficiently competitive environment in order to establish a market price. Df.'s Brief 12–13.

■ From this phraseology, it is apparent that defendant's counsel places his main reliance on reason (2). This is understandable, for the record in this case simply will not support reason (1). To the contrary, plaintiff demonstrated a sizeable number of sales reasonably similar to those made to Fort Leavenworth. This observation is made with full recognition of the fact that "similar" is a relative word and that exact "white-mule" similarity hardly ever obtains. Substantial similarity, however, is requisite. *See Fairmount Cemetery Association v. Helvering*, 67 App.D.C. 345, 92 F.2d 496 (1937); *Phillips Petroleum Co. v. Bynum*, 155 F.2d 196, 198 (5th Cir. 1946).

---

7. In fact, at trial plaintiff's objection to this evidence was sustained. At defendant's request, however, the objectionable evidence was allowed into the record as an offer of proof under Rule 133.

Plaintiff presented convincing evidence of large-volume direct sales of natural gas made by it and another pipeline company (Panhandle Eastern) during the periods relevant here, all of which defendant agrees are the "closest available." Df. Br. p. 45. For example, Cities has been making and still makes a large-volume firm sale to Goodyear Tire and Rubber Company for use as process gas in its plant located in northeastern Kansas. During the periods here involved, Goodyear has been paying prices for this gas generally comparable to those claimed herein by Cities for firm service furnished to Fort Leavenworth.

Cities also makes large-volume interruptible direct sales to 17 other industrial customers in eastern Kansas. The volumes sold to these customers are comparable to the volumes delivered to Fort Leavenworth, i. e., all use in excess of 10,000 Mcf of gas per month. The prices which these direct customers have been paying Cities for their gas generally have been higher than those Cities is now claiming for the direct sales here involved. Nonetheless, each of these large-volume direct customers entered into contracts with Cities for the continuation of their purchases of the gas.

Most, if not all, of Cities' interruptible customers are equipped to burn other fuels as well as natural gas. Yet this appears to be the only significant difference between these sales and those by plaintiff to defendant here involved, that is to say, they were made on an interruptible basis with the purchaser having adequate conversion equipment and an alternate source of fuel, whereas, except for the Disciplinary Barracks, plaintiff's sales to defendant were made on a firm basis for use in areas where defendant had no such conversion equipment. However, the testimony of plaintiff's expert compensated for this difference by clearly demonstrating not only that, historically, firm service was more valuable than interruptible service, but that, as a result, firm service enjoyed a 50 percent premium price over interruptible service. He utilized this historical fact to provide a means for adjusting the prices as between firm and interruptible service. This approach, in my opinion, constituted a reasonable and useful aid in determining the marketplace value for natural gas during the periods and in the area here involved, and accordingly, defendant's reason (1) is deemed to be without merit.

■ Proceeding, then, to an examination of defendant's reason (2) for its position that no prices exist which can be used to establish a market value for natural gas, namely, the contention that, even if plaintiff's sales to others were similar to its sales at Fort Leavenworth, such sales do not establish a market price because, in defendant's view, they took place in a noncompetitive environment. Defendant here seems to be suggesting that there can be no competitive market for direct sales of natural gas because, as defendant sees it, a natural gas pipeline operation such as Cities' constitutes an effective natural monopoly.

While Cities' take-it-or-leave-it approach to its direct customers is suggestive of a typical monopolistic attitude, there is nothing in the record to show that Cities in its pricing policies did not take into account the prices being charged by other pipeline companies for their natural gas, the prices being charged by suppliers of alternate fuels, or that Cities in any way discriminated as between customers. In fact, the evidence is all to the contrary and is hardly consistent with the traditional attitudes to be expected of a monopoly.

However, while not denying that Cities' prices for natural gas were considerably less than the prices being charged for all alternate fuels, defendant says it is unfair to make such comparisons because of the fact that Fort Leavenworth only has limited facilities for using such alternate fuels, and that the acquiring of adequate conversion facilities would require an exorbitant capital expenditure at Fort Leavenworth. The answer is simply that, many years ago, defendant voluntarily selected natural gas as its main fuel for this military installation, and the record shows that, even if Fort Leavenworth were fully equipped with conversion facilities for the use of other

fuels, defendant still could not purchase such alternate fuels for less than the natural gas prices here claimed by Cities. This was also true in the case of all other direct customers of Cities. It no doubt accounts for the fact that most of Cities' other direct customers, while exhibiting some resentment at what they considered a high-handed attitude by Cities, continued to purchase natural gas from Cities at increased prices.[8] Defendant, like everyone else, simply finds itself caught up in the inflationary spiral of prices for energy products.

From the foregoing analysis, it has been concluded that defendant's contention is erroneous[9] and that plaintiff has satisfactorily demonstrated the existence of a market price for natural gas in the area of Fort Leavenworth during the periods involved. That market price as shown by Cities' expert witness should properly be derived from consideration of the known market prices for comparable fuels coupled with a comparison of the actual prices for other unregulated sales of natural gas throughout the area involved since March 1971.

Cities claims prices for its natural gas sales to Fort Leavenworth which are even less than the prices so determined by its expert witness. Accordingly, Cities is entitled to judgment in its favor, the exact amount of which, in the absence of agreement, must be determined in further proceedings under Rule 131(c).

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion which are adopted by the court and made a part of the judgment herein,

8. Cf. Holmes, Collected Legal Papers, 280–1 (1920) where he observed: "But it seems to me that if every desirable object were in the hands of a monopolist, intent on getting all he could for it, . . . the value of the several objects would be settled by the intensity of the desires for them respectively, and they would be consumed by those who were able to get them and that would be the ideal result."

9. Indeed, as an alternative argument, defendant has contended that sales of gas to municipalities in Kansas are sufficiently comparable to plaintiff's sales to Fort Leavenworth as to establish a marketplace value for natural gas.

the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect, with the determination of the exact amount of recovery to be made in further proceedings under Rule 131(c).

This is not true, of course, since the sales to municipalities are *regulated* sales at a rate fixed by the FPC in the same fashion used by defendant's expert in this case. That this technique is in error is clear from this court's instructions to the Trial Division as pointed out above. *See*, also, *United States v. New River Collieries*, 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014 (1922), where the Supreme Court specifically approved the exclusion of any determination based upon production costs plus a fair profit (the FPC method) in a case where a market price for the product existed.