The HEARST CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 704–89T.

United States Court of Federal Claims.

May 4, 1993.

---

James W. Paul, New York City, attorney of record, for plaintiff. Robert T. Carney, Barry W. Rashkover, David F. Matlin, and Rogers & Wells, of counsel.

Robert J. Higgins, Washington, DC, with whom was Acting Asst. Atty. Gen. James A. Bruton, attorney of record, for defendant. Mildred A. Seidman and David Gustafson, of counsel.

## OPINION

HARKINS, Senior Judge:

The Hearst Corporation, plaintiff, seeks a refund of income tax for tax years 1981 through 1985 based upon a charitable contribution to the University of California at Los Angeles, California (UCLA) of the Hearst Metrotone News Film Library (Library). Hearst documented the donation by letters dated November 30, 1981, March 5, 1982, February 1, 1985, and November 18, 1985; UCLA's acceptance of the Library is documented by letters dated December 2, 1981, March 8, 1982, February 5, 1985, and November 19, 1985.

In its tax returns for the relevant years, Hearst reported fair market values for the Library in total amount of $62,000,080. In its examination of each of the years, the IRS found Hearst had not established that the fair market value of the Library exceeded a specified amount, and disallowed the remainder. The total of the amounts recognized and allowed by the IRS was $1,847,844.[1] During trial on this claim, each party presented testimony and reports on valuation issues by witnesses recognized as experts. In its posttrial brief, plaintiff contends the fair market value of the Library was $35 million. In its posttrial brief, defendant contends the fair market value was $1,350,194, and, because the fair market value is less than the amount already allowed by the IRS, no refund is owed.

Hearst timely filed returns for the years in issue, timely paid all assessments, and timely claimed refunds for the donation. The deficiency notice for tax year 1981 is dated June 3, 1986, for tax years 1982 and 1983, the deficiency notice is dated June 23, 1988, and for tax years 1984 and 1985, the deficiency notice is dated June 29, 1990. Plaintiff's claim for a refund of tax and interest paid for tax year 1981 was denied by the IRS by letter dated May 12, 1988. The IRS has not responded to plaintiff's claims for refunds with respect to the assessments for tax years 1982 through 1985.[2]

In the course of trial preparation and posttrial briefing, the parties have agreed upon a total of 97 stipulations of fact. These stipulations resolve substantial areas of the factual nexus of the donation. All of the facts stipulated have been adopted as findings of fact by the court. Although all stipulated matters are not duplicated,

---

1. Defendant contends that, after audit, the total fair market value recognized by the IRS was $2,026,788. Defendant does not show how this amount was determined.

2. On Oct. 29, 1992, the name of the court was changed to the United States Court of Federal Claims, by the Federal Courts Administrative Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), Title IX, Section 902.

the narrative that follows is based upon and is consistent with the stipulations. For continuity, some of the stipulations are repeated. Findings of fact in the narrative that supplement or add to the parties' stipulations are based upon testimony and documentary evidence presented during the 10–day trial.

The Hearst Corporation, with its wholly owned subsidiaries, is engaged primarily in publishing, syndication, and radio and television broadcasting. Hearst started film news coverage in 1913. Between 1918 and 1928, the Hearst organization produced a silent biweekly newsreel, the Universal–International Newsreel, for distribution through the Universal Pictures network. With the advent of sound, and to 1934, the Hearst Metrotone Newsreel and the Fox Movietone Newsreel were produced jointly under a coproduction agreement with Fox, and Metrotone's biweekly sound newsreels were distributed through MGM outlets. On November 9, 1936, the name of the newsreel was changed from "Hearst Metrotone Newsreel" to "News of the Day." In the 1950s, Hearst started to produce for television broadcast a syndicated news service (Telenews TV Daily) and a syndicated sports feature (This Week in Sports). In 1978, these film operations were handled in the King Features Syndicate Division of Hearst.

In 1978, officials in the King Features Syndicate Division undertook a study of the feasibility of a donation of the Library to the United States Government. At that time, the exact size of the Library as a whole, and the composition of its various elements, was unknown. Inventory records were incomplete or did not exist. Film materials were in remote storage facilities. Estimates, based on vault capacities, and an imprecise count of cans in storage, were used by various appraisers and by the donor's officials. The condition of the film in the cans and extent of deterioration of nitrate based film had not been

investigated and was unknown. Estimates of the total size varied from 26 million feet to 30 million feet. Appraisal reports and the report of the archivist for the UCLA Film and Television Archive presented at trial reflected differences in estimates of size and condition.

The parties have stipulated that the Library consisted of approximately 27,117,-000 feet of film of which approximately 10,212,460 feet were on nitrate film stock and 16,904,540 feet were on acetate safety film. Approximately 3 million feet were duplicate footage, some of which consisted of preservation copies created by Hearst of silent era nitrate footage.

Film elements of the Library were identified in the following categories:

a. Volumes 1–11 of the Hearst International Newsreel;

b. Volumes 1–3 of the Hearst MGM Newsreel;

c. Volumes 1–39 of the Hearst Metrotone Newsreel and News of the Day;

d. Cuts and Vault Material related to Volumes 1–39 of the Hearst Metrotone Newsreel and News of the Day;

e. Volumes 7–15 of Telenews TV Daily;

f. Volumes 5–14 of This Week in Sports;

g. Color stock shot film [3].

The Library, in addition to film materials, included nonfilm items. The nonfilm items included a system of index cards, nonfilm related memorabilia such as synopsis sheets, and copyrights to certain of the film items.

Film materials included:

Released Footage—newsreels in the form released for distribution;

Cut material—film material once part of the original footage shot for possible inclusion in a newsreel, but which subsequently had been edited and removed from the final release version (sometimes referred to as "cuts and outs");

---

**3.** **Stock Footage:** Any existing footage suitable to be used in another product to depict an event or suggest a circumstance which would otherwise have to be filmed again. Stock footage (the origin of which may be newsreels, includ-

ing cuts and vault material, or feature films) is offered for license by businesses or public institutions. The cost to the licensee of any such footage usually depends upon the type of production and/or intended market of the licensee.

Vault material—film material made by Hearst, or purchased, that had been shot for possible inclusion, in whole or in part, in the release version of a newsreel, none of which footage was ever included in a released newsreel story.

Approximately 5.7 million feet (21 percent) of the Library film, consists of released footages; approximately 21.4 million feet (79 percent) are unreleased footages. Approximately 7,110,000 feet (33 percent) of the Library's unreleased footage consists of cuts. Approximately 13,775,000 feet (65 percent) of the Library's unreleased footage consists of vault material.

The total running time of the Library was approximately 5,922 hours. When adjusted to compensate for duplicate footage, actual screen time would amount to approximately 5,330 hours.

The Library included 35 mm film and 16 mm film. Approximately 88 percent (24 million feet) was on 35 mm film, with 12 percent (3.2 million feet) on 16 mm film. Approximately 545,000 feet of the Library film material is color stock, with 179,809 feet on 35 mm film and 365,068 feet on 16 mm film.

Between 1950 and 1952, the motion picture industry phased out the use of nitrate base film and shifted to production on acetate (safety) film. The UCLA archivist based his estimate of the amount of nitrate film in the collection on a soft cutoff date of 1952, as well as on the number of nitrate vaults used to store nitrate material. He recognized that Hearst did receive nitrate after 1952, and also had converted some of the material to acetate. Acetate materials occasionally were stored with nitrate materials. According to the UCLA archivist's report approximately 1.4 million feet of the released newsreels on nitrate stock had sound; and approximately 120,000 feet were silent. Cuts on nitrate film amounted to approximately 4.5 million feet, and vault material on nitrate film approximated 3.9 million feet. Approximately 2.8 million feet of the released newsreels on acetate film were on 16 mm. Cuts on acetate film amounted to approximately 2.6 million feet, and vault material on acetate film approximated 9.9 million feet.

The film materials included: original negatives [4], duplicate negatives [5], fine grain master positives [6], and preprint material [7].

Excluded from the contribution was a group of materials classified as "derivative works." This group, which included 15 series, consisted of edited film programming produced and released by the Hearst Corporation. This programming contained, in varying amounts, images originally exposed on film which originally were part of the Library.[8]

4. **Original Negative:** The film whose light-sensitive emulsion is exposed during the operation of the camera. An original negative contains images whose colors and tonal values are the exact opposite of those of the original subject matter.

5. **Duplicate (or "Dupe") Negative:** A negative, usually struck from a fine-grain positive print, which is generally used to make multiple reproductions of prints. A dupe negative preserves the original negative from damage during the process of creating more prints. A "composite duplicate negative" carries both image and sound in synchronization.

6. **Fine–Grain Master Positive:** A high quality print generally made on film stock of low contrast emulsion, usually from original negative film. A fine-grain master positive is designed to be used in the preparation of duplicate negatives rather than for projection. A "composite fine-grain master positive" combines, on one strip of film, the images from the picture negative and the sound track negative.

7. **Preprint Material:** Film elements created prior or to the striking of a release print, such as negatives, fine-grains, and archival master prints. Most preprint material is on film stock having sharper resolution and different emulsion sensitivity characteristics than release prints. Preprint material usually is manufactured with sprocket holes specially designed to ensure precision printing. Although archival master positives have the same physical characteristics as release prints, archival master positives are considered preprint material because they are used for reproduction purposes when other material is unavailable.

8. The derivative works (and their cumulative running times) were:

    a. *Almanac*—365 three minute vignettes about people, places and things from the period 1920 to 1960. (19 hours)

    b. *Big Moments in Sports*—150 three minute programs about athletes and sporting events from the period 1920 to 1961 (7½ hours)

Plaintiff's decision to donate the Library to UCLA was developed during a period that started in mid–1978 and culminated on December 10, 1980, with the Hearst Board's approval of a recommendation developed by officials in the King Features Division. Such a donation was first suggested by the Director of Operations, Television and Motion Pictures,[9] who also made the preliminary study at the request of the division president[10]. Subsequently, the Hearst Corporation's Executive Assistant to the President,[11] Treasurer[12] and the Tax Manager[13] participated in the decision to accept a commitment from UCLA with respect to aspects of the donation and in the recommendation to the Board.

At all times during the preliminary study, exploratory discussions with potential donees, and in the consideration, of UCLA's commitment, King Features and Hearst officials viewed the contribution as a gift of the entire Library. There was no intention on the part of Hearst officials to donate less than the entire Library to any donee. For its part, UCLA made the commitments and undertook the resulting activities, with the expectation that it would receive the entire Library. Throughout the development period, each party emphasized the importance of income tax considerations in making the donation and in timing the transfer of the property to UCLA.

Results of the preliminary study as to the feasibility of donating the newsreel archives to the Government were reported on August 18, 1978. Exploratory talks had been held with representatives of the IRS, the National Archives, and the Library of Congress on the tax effect of placing the "entire library in the public domain," and with the company that had appraised the Universal Newsreel library when it was donated to the National Archives. A value of $0.50 to $1 per foot donated was considered to be "a conservative number." In 1972, in connection with Hearst's purchase of MGM's position in the newsreel company, a value of $597,849 was placed on the Library. Since that time, it had been written off yearly at the rate of 10 percent. The report concluded, "[i]f the gift is accepted and our appraisals are accepted, we could realize a very large tax saving, as

c. *Campaigns*—11 five minute programs of United States presidential races from 1928 to 1968. (1 hour)

d. *The History Makers*—10 twenty minute profiles, including three shows on FDR, two shows each on Truman, Eisenhower and JFK, and one show on Eleanor Roosevelt. (4 hours)

e. *News of the Day Yesterday*—14 twenty-five minute programs, seven of which concern news events and seven are about sports events, from 1930 to 1960. (6 hours)

f. *Our Times*—35 twenty minute issues of a news magazine produced in the period from 1954 to 1957. (12 hours)

g. *Perspective on Greatness*—26 one hour biographical documentaries of famous people and their times. (26 hours)

h. *Screen News Digest/Hearst Reports*—topical 15 minute programs about United States Presidents, world history, space, business, aviation, foreign leaders, science, agriculture and economics produced in the period from 1958 to 1983. (64 hours)

i. *Telenews Weekly*—552 fifteen minute weekly summaries of news events during the period from 1954 to 1963. (138 hours)

j. *Time Capsule*—2,000 one minute stories about people and events of the past sixty years. (40 hours)

k. *Time Out for Sports*—26 fifteen minute programs from the period 1920 to 1950. (6½ hours) Much of the footage is the same as that included in Big Moments in Sports, but the stories are longer versions.

l. *Where Are They Now*—8 three minute programs about eight individuals, shown in the present and the past, all filmed in 1960. (½ hour)

m. *Year End Symposiums*—18 twenty-five minute annual reviews of the news, nine of which are devoted to headline news during 1956 to 1965 and nine of which are devoted to sports from 1954 to 1962. (7½ hours)

n. *Years in Review*—10 seven to ten minute films summarizing the news highlights of the 1930's. (1½ hours)

9. Charles E. Shutt.

10. Joseph F. DeAngelo.

11. Benson M. Srere.

12. Harrison A. Mitnick.

13. Stanley A. Gottlieb.

well as solving our nitrate problem when we duplicate the entire Library."

The preliminary study was concluded by a report dated October 2, 1978. A donation to the Library of Congress rather than to the National Archives was recommended because Archives was "looking only for years of material they do not now have in their possession." In a donation to the Library of Congress "a possible and sizeable tax reduction could accrue to our advantage." The Library of Congress had a storage problem and scheduling the donation over a period of 5 years or more "would not only accommodate the storage capacity of the Library, but might suit our purposes as well." The report recommended, once the tax department determined Hearst's position, that appraisers and historians evaluate the Library. On the basis of conversations with appraisers and others in Government, the report contained a possible appraisal value. This preliminary appraisal, based on a footage of 29,400,000 feet, and a per foot price in a range of $1 for color to $0.25 for black and white materials, produced an estimated total value of the Library of $21,912,500.

Further discussions were held with the Library of Congress and with the National Archives. By March 12, 1980, the King Features personnel became concerned with the slowness of the Library of Congress and the National Archives in reaching a decision. A call to the Library of Congress disclosed that it would reply in a manner that would neither accept nor refuse Hearst's tentative offer. Archives was interested and was still "a good possibility." In any event, the King Features personnel were confident that one of the "major journalism/communication universities, such as Columbia, Missouri, Ohio State, UCLA, or Stanford would be likely prospects."

On March 27, 1980, the Library of Congress explained its hesitance and recommended a renewed approach to Archives. On July 3, 1980, National Archives advised it was interested in obtaining all edited newsreel stories and selected news related outtakes, that it was not interested in color stock shorts or short subjects, and that

nitrate film would have to be converted to safety before transfer "since we will not accept offers of nitrate film." In further discussions, Archives officials indicated, however, that if Hearst would give the Library only in its entirety, the National Archive's answer most likely would be yes. The July 9, 1980, report recommended that, if the decision was to go with the National Archives, that "we make the gift offer only on the basis of the entire Library."

By letter dated July 7, 1980, UCLA expressed its "active interest in acquiring the Hearst Metrotone Newsreel Collection for deposit in our Film Archives." The letter listed benefits that would result from the gift and emphasized that UCLA would insure the broadest possible public recognition for the contribution. UCLA would "actively publicize the gift and would dramatize its importance to scholarship." Another benefit was recognition that gifts to a nonprofit organization would result in substantial tax advantages to the donor. UCLA offered to contribute to the expense of appraising the collection for tax purposes.

Further discussions with UCLA resulted in an offer of a formal commitment to accept the Library. In a letter dated August 21, 1980, UCLA listed its activities and services that went far beyond those of the Library of Congress. This superiority was described as an important consideration in Hearst's deliberations "about the appropriate recipient of your generous gift." The letter pointed out that the Library would be UCLA's "exclusive newsreel collection" and would serve as UCLA's "major documentary resource for the history of this century." The letter committed UCLA to the following:

1. We will accept the gift of the Metrotone Newsreels in the College of Fine Arts at UCLA. We do so with enthusiasm and gratitude.

2. We will be responsible, upon deed of gift, to transport the Library from its present location to the UCLA Film Archive in Los Angeles.

3. We will provide and pay for a formal appraisal of the Library.

4. As part of our overall 10–year plan, we will convert the nitrate film of the Library to safety film. We understand that 50 percent of the collection and holdings are on nitrate film. During the course of this conversion, all of our nitrate film is held in a specially constructed nitrate vault.

UCLA pointed out that additional tax advantages could be obtained by including in the gift nonfilm items and nonfilm related memorabilia. The letter listed (a) all Metrotone Newsreel business records and other related records that may be in storage, (b) the index and catalogue, and (c) copyright for the Library. UCLA recommended an appraisal expert who would "explain the tax and research advantages" and observed that Hearst could learn that "the combination of all materials will result in a 'package' that is worth far more than the value of the separate parts."

The August 25, 1980, report on UCLA's commitment emphasized the additional tax advantages that had been identified. The report observed that "UCLA's proposal outweighs the proposals received from the University of South Carolina and the National Archives."

By letter dated September 4, 1980, King Features management advised the Hearst Corporation treasurer that the proposal to give the Library to UCLA had been considered and that "we are formally requesting permission to make such a gift." The letter reiterated the August 21, 1980, commitments that UCLA had made, noted that the proposal from UCLA is far better than those of the University of South Carolina and the National Archives, and recommended it be accepted.

On October 30, 1980, Hearst's tax manager gave Hearst's treasurer two schedules that showed the difference in tax effect if the Library contribution were to be made in 1980, as distinguished from a contribution in 1981.[14] For these calculations, Hearst's taxable income for 1980, as then determined, was adjusted by a 10 percent increase per year to derive an estimated taxable income for tax years 1981–86. One schedule valued the Library at $1 per foot; the second schedule valued the Library at $0.50 per foot. Each schedule was based on a gift of the entire Library in 1980 or 1981, and showed the applicable carryover for each of the succeeding years. The $1 per foot valuation schedule showed carryovers that reached zero in 1986. The $0.50 per foot valuation schedule showed carryovers that reached zero in 1984.

The schedule with the $1 per foot valuation showed that a contribution made in 1980, would produce by 1986 a tax benefit of $14,059,900, with a present value of tax savings of $11,578,674. A contribution in 1981 would produce a tax benefit of $16,100,000, and a present value of tax savings of $12,916,160.

The schedule based on a $0.50 valuation showed that a donation made in 1980 would produce by 1984 a tax benefit of $9,200,000, and a present value of tax savings of $8,096,174. A contribution in 1981, would produce by 1984 a tax benefit of $9,200,000, and a present value of tax savings of $8,090,600.

Minutes of the December 10, 1980, meeting show that the Hearst Board of Directors considered the "donation" to UCLA, and that materials relating to "the proposed donation" were distributed by the treasurer. "Basic facts re the donation" included:

---

**14.** Hearst had in process a program in which the clipping morgue of the San Francisco Examiner, valued at $5 million, would be contributed to the Hoover Gallery of San Francisco, and the clipping morgue of the Los Angeles Herald Examiner had been donated to the University of Southern California. This program had an impact on the contribution carryover allowable to Hearst for the succeeding 5 taxable years for contributions in excess of the 5 percent limitation on contributions in the donation year.

Total footage—29,400,000

Estimated cost to convert nitrate to safety—$3,500,000

Net Revenues earned from Library:

| | | | |
|---|---|---|---|
| 1975–1979 Average Revenue | $ 71,200; | Net | $ 57,000 |
| 1980 (Est.) Revenue | $153,500; | Net | $126,000 |

Estimated value of income tax benefits:

| | | | |
|---|---|---|---|
| At $1 per foot: | deduction | — | $29,400,000 |
| | present value | — | $11,400,000 |
| At $0.50 per foot: | deduction | — | $14,700,000 |
| | present value | — | $ 6,250,000 |

---

The reasons management considered favorable for the contribution of "this valuable asset" were outlined at the December 10, 1980, meeting. As a result of discussion, the following resolution was adopted:

RESOLVED, that the proper officers of this Company be, and they hereby are, authorized and empowered to inform the University of California at Los Angeles of the intent of the Company to donate to that institution the Hearst Metrotone News Film Library, consisting of approximately 29.4 million feet of film together with all available continuity sheets and other written materials relating to said film, said donation to be made at such time or times, and in such quantity or quantities, as this Board approves.

At the Board meeting on June 24, 1981, Hearst's treasurer reported on the status of the "proposed gift" of the Library to UCLA. Appraisal of the Library then was in progress. At that time, a schedule for delivery of the donation had not been made. The minutes include the following:

Decisions as to whether and when the donation will be made by the Company will depend upon a resolution of relevant tax issues and the completion of the appraisal. To date, no gift has been authorized by this Board, Mr. Mitnick reminded the Members.

King Features Division's status report for July 2, 1981, to Hearst's executive assistant to the president contains the following recital:

We are in the process of having our library appraised by the American Appraisal Co. Upon completion of this appraisal at the end of this month, we will shortly donate the entire library of 30,-000,000 ft. to the University of California, Los Angeles.

By September 23, 1981, the American Appraisal Company had completed its appraisal of the entire Library, and had delivered its results to Hearst. The total valuation was approximately $62 million. The amount is an estimate; calculations on which this amount is based, and its relationship to analysis of the elements that comprise the Library, are not in the record. It is clear that the valuation was not the product of a physical inventory of the Library components. American Appraisal's valuation was used to reach the estimates of value involved in deliveries of particular portions of the Library, as well as for the valuations reported to the IRS for tax years 1981–85.

Hearst's concern over timing the donation so as to realize a maximum tax allowable over a period of time, and UCLA's concern over its inability to accept the entire Library at one time, were resolved by the adoption and implementation of a formal structure for the donation. This structure consisted of (1) a Hearst Board authorization, (2) a donation letter from Hearst, and (3) an acceptance letter from University of California Regents (Regents). This structure created formal legal relationships during the delivery period of the donation that, although valid, were not asserted by either party.

Structured delivery was established at a Hearst Board meeting on September 23, 1981, and for UCLA at a meeting on No-

vember 20, 1981, of the Regents. Hearst would donate the "entire Film Library [to UCLA] by making several contributions over a period of time, each contribution to be of a specific portion of the Film Library" and specifically approved by the Board in advance. The Regents agreed to accept a gift-in-kind of "some or all" of the Library "in one or more portions at such time or place as each such portion is offered for acceptance." The Regents' resolution defined the legal rights and obligations that were authorized to be accepted in six provisions, (a) through (f).

Ultimately, under this formal structure, Hearst authorized and transferred contributions of specific portions for delivery in tax years 1981, 1982, 1984, and 1985. The authorizing resolution for the 1981 tax year implemented the December 10, 1980, resolution to donate the entire Library to UCLA. It contained a series of five preambles that reflected prior considerations and present status, two of which state:

WHEREAS, this Company wishes to realize the tax benefit which will result to this Company if the deduction provided by the Internal Revenue Code for the contribution of the entire Film Library is fully utilized over a period of time; and WHEREAS, to utilize the allowable tax deduction available under present law for taxable year 1981, management has recommended that no later than March 14, 1982, the delivery be made of a contribution of certain identified portions of the Film Library having a total value of $20,-284,800,

Subsequent resolutions for tax years 1982, 1984, and 1985 recited verbatim the objective of the December 10, 1980, resolution, as follows:

WHEREAS, this Board of Directors at its meeting held December 10, 1980 expressed its intention to donate the entire Hearst Metrotone News Film Library to the University of California at Los Angeles (UCLA) by making several contributions over a period of time, each contribution to be of a specific portion of the Film Library and to be specifically approved in advance by this Board of Directors; and

In each resolution, the premises reiterated the size and amount involved in the prior Board resolutions that had approved the first, second, and third contributions. The final premise of the September 18, 1985, resolution on the "fourth and final contribution of the balance" of the Library, states:

WHEREAS, to utilize the allowable tax deduction available under present law for taxable year 1985, management has recommended that the delivery of the final contribution of identified portions of the Film Library having a total value of $16,-098,100 be made no later than March 14, 1986.

Formal legal relationships were memorialized in letters exchanged with respect to each of the four contributions.[15] Apart from descriptions of the portions of the Library involved (see Appendix), these successive gift instruments duplicate the same provisions verbatim, and their recitation is pro forma.

The standard "boiler plate" terms in Hearst's letters provide:

(1) notice of the location of the property at Bonded Services warehouse, a copy of Bonded's agreement to recognize UCLA's ownership, and a warehouse receipt, delivery of which signifies the property is held subject to UCLA's shipping instructions;

(2) that from and after Hearst receives "your written acceptance" UCLA shall be the sole owner, bear entire risk of loss, and be responsible for future storage charges;

(3) the amount of any footage from the property that is on loan to film laboratories by virtue of Hearst's stock footage operations, and provides that any monies received from these prior contracts will be paid over to UCLA;

(4) assignment of all rights in the property, including copyrights but excluding trademarks or service marks, prior claims or choses in action, any rights to derivative works, or "Hearst's right to

---

**15.** Hearst's letters dated Nov. 30, 1981 (First portion); Mar. 5, 1982 (Second portion); Feb. 1, 1985 (Third portion); and Nov. 18, 1985 (Fourth portion); and the Regents' acceptances dated, respectively, Dec. 2, 1981, Mar. 8, 1982, Feb. 5, 1985, and Nov. 19, 1985.

prepare further derivative works from the Derivative Works;"

(5) identification list of Derivative Works not included in the donation;

(6) Regents are held harmless from any claim arising from Derivative Works;

(7) condition of property is as-is, without representation or warranty of condition or quality;

(8) Hearst will execute additional documents if needed to evidence the gift without additional cost; and

(9) a request for access to the property for appraisers.

The standard terms in the Regents' acceptances provide:

(1) Recognition of location of property at Bonded Services, assumption of risk of loss, and liability for future storage charges;

(2) UCLA looks forward to possibility of future gifts "so that the entire collection can be used for scholarship purposes" (omitted from the final November 19, 1985, letter);

(3) Regents' representation that it is a political subdivision under IRC § 170(c)(1) and not a "private foundation" under IRC § 509.

(4) Hold harmless provision for Hearst from any claim arising from Regents' use of the property; and

(5) Consent to access as requested.

During the period between the Regents' acceptance on December 2, 1981, and its final acceptance on November 19, 1985, the legal relationship of the parties was such that each party could change its mind about the remaining portions of the Library. Neither was obligated legally to continue the donation. There was no binding commitment that could be asserted against Hearst to give any more of the Library property than had already been given. Nor was there a binding commitment that would prohibit UCLA from refusing to take any more property than had already been accepted.

During the 1981–85 period, Hearst exercised control over portions of the Library until the cans of film physically were transferred to UCLA, and utilized those portions to license stock footage and to produce programming. Before making the donation for 1981, Hearst paid $34,695 to make copies of the index cards for the Library (the entire card file accompanied the 1981 donation) so it could be able to access post–1954 Library materials and service requests for stock footage. During the period 1982–84, Hearst's average annual gross sales of Library footage amounted to approximately $83,000.[16]

Film materials in the Library are made accessible through an index of approximately 450,000 cards. The card index catalogues all the film in the Library, including the silent newsreels, sound newsreels, cuts, vault material, Telenews TV Daily films, This Week in Sports films, and color stock shots. The cards comprising the index are organized and cross-referenced by subject, personality, and location. The cards comprising the index indicate whether the footage referenced is released footage, cuts, or vault material. The cards state the date the material was received, the volume and issue and release date of the newsreel it was used in (when applicable), and the date of the story itself.

The approximately 10.2 million feet of film in the Library on nitrate film stock accepted by the Regents were included in the deliveries for 1981 and 1982. A memorandum dated February 3, 1982, prepared for the February 4, 1982, Board meeting, describes nitrate film as "highly flammable" which by law requires special handling. The memorandum notes that some nitrate film had been donated in 1981, and states "[n]ow the company wants to donate the remaining nitrate film without delay."

## DISPOSITION

■■ The Internal Revenue Code allows as a deduction from taxable income any charitable contribution, as defined, payment of which is "made within the taxable

---

**16.** Another $83,000 per year during the 1982–84 period was derived from sales of footage from derivative works, which were excluded from the donation.

year." A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary of the Treasury. 26 U.S.C. § 170(a). The deduction is authorized to encourage contributions to charitable organizations, and to reward donors for their benevolence. As long as there is a bona fide gift, the taxpayer's motivation essentially is immaterial. Even where the donation is made solely for the purpose of obtaining a tax benefit, the taxpayer is entitled to the deduction to the extent of the fair market value of the property given.[17]

The parties agree that Regents is an organization described in IRC § 170(c)(1), that Hearst made a charitable contribution within the meaning of IRC § 170, and that Hearst is entitled to a tax deduction. The primary issue, therefore, is the amount of the tax deduction. Subordinate issues are the valuation date of the contribution and the fair market value of the contribution.

The Treasury Regulations require the amount of a contribution in property other than money to be valued at "the fair market value of the property at the time of the contribution." 26 C.F.R. § 1.170A–1(c)(1). Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 1.170A–1(c)(2). Ordinarily, a contribution is considered to have been made at the time delivery is effected. 26 C.F.R. § 1.170–1(b). In appropriate circumstances, "delivery" can be made by means of a duly executed deed of gift, with physical possession of the property to be transferred subsequently. Where the instrument clearly and unmistakably announces a present transfer of the gift and places the property beyond the power of the donor so as to divest dominion and control over the property, delivery of the instrument can satisfy the "delivery" requirement.[18] The letters exchanged with respect to each of the four contributions, which memorialized the formal legal rela-

tionships, were executed by persons authorized to so act and are binding on the parties.

■ Plaintiff contends the Library was donated in four separate gifts, each with a separate valuation date established by the Regents' acceptance letters. Plaintiff argues each of the four gifts constituted a separate "charitable contribution" under Section 170 and its related Treasury Regulations. Plaintiff points to the following sequence to show that Hearst was punctilious in satisfying the elements of a gift: (1) Hearst expressed a separate present intent to donate a specified portion of the Library on each of the four gift dates through a separate Board of Directors resolution passed shortly before each such conveyance; (2) Hearst thereafter delivered legal right, title, and interest in one portion of the Library on each such date, pursuant to a separate deed of gift that identified precisely the property conveyed; (3) each deed plainly stated Hearst's intention to relinquish dominion and control over that property identified, and only that property, and for title to vest with the Regents; (4) Hearst actually delivered each such portion separately pursuant to a warehouse receipt that accompanied each deed of gift and specifically identified only the portion of the collection conveyed; (5) UCLA shortly thereafter accepted all right, title, and interest in each portion of the Library pursuant to a letter of acceptance sent to Hearst following its receipt of each deed.

Defendant contends that, for purposes of IRC § 170(a)(1), there was only one gift, and the valuation date for all of the Library property should be November 30, 1981. Defendant argues Hearst's Board of Directors authorized this donation on December 10, 1980, and thereafter, Hearst always intended to donate the Library in its entirety. Also, UCLA always expected to receive the Library in its entirety. After November 30, 1981, the plaintiff no longer owned the entire property at issue so it could not have been sold to a willing buyer.

17. *Sheppard v. United States,* 361 F.2d 972, 981–82, 176 Ct.Cl. 244 (1966).

18. *Greer v. Commissioner,* 70 T.C. 294, 304, 1978 WL 3242 (1978), *aff'd,* 634 F.2d 1044 (6th Cir. 1980).

Defendant further states that the Hearst Corporation reached a binding agreement in 1980 with the University of California to donate the entire property at issue to that institution. Whether the agreement could have been enforced in a court of law under contract principles is moot as both parties fulfilled all aspects of the agreement. After November 30, 1981, the price at which the property would change hands under 26 C.F.R. § 1.170A–1(c)(2) could no longer be determined since the "property" no longer existed as an integral whole and clearly was not for sale.

Plaintiff argues that defendant's theory of a 1981 gift of the entire Library amounts to an assertion of the conveyance of future interests in the property. A future interest theory would assume that Hearst gave a future interest in the remainder of the Library to UCLA at the time the first portion was donated, which ripened as a charitable contribution subsequently on the dates it gave up possession of the Library portions. "[P]ayment of a charitable contribution which consists of a future interest in tangible personal property shall be treated as made only when all intervening interests in, and rights to the actual possession or enjoyment of, the property have expired." IRC § 170(a)(3). The Treasury Regulations describe situations where a future interest arises when a contribution donor purports to give property to an organization, but by agreement with the organization reserves a right to use and to possess the property. On subsequent relinquishment of use and possession, and delivery of the property, the contribution is so treated and valued as of the subsequent date. 26 C.F.R. § 1.170A–5(a)(4).

Defendant, however, does not base its argument on a future interest theory. A donation of future interests in the Library in 1981 would require calculations that would show changes in fair market value of each subsequent portion from 1981 to the date of actual delivery. Plaintiff's experts valued the entire Library as of four dates. No evidence in the record reflects calculations that would apply to donations of future interests.

The underlying theory of defendant's argument is that the tax consequences of business transactions are properly determined by their substance and not by the form in which they are cast. Whether separate steps of a complex transaction are to be accorded independent significance or are to be treated as related steps in a unified transaction is a recurring problem in the field of tax law.[19]

A step transaction analysis is an attempt to look through the form of a transaction which was designed to accomplish a particular tax consequence to the reality of the transaction.[20] The essence of the step transaction doctrine is that an "integrated transaction must not be broken into independent steps or, conversely, that the separate steps must be taken together in attaching tax consequences."[21] There is no universal test applicable to step transaction situations. It has been suggested persuasively that "the aphorisms about 'closely related steps' and 'integrated transactions' may have different meanings in different contexts, and that there may be not one rule, but several, depending on the substantive provision of the Code to which they are being applied."[22]

In *King Enterprises, Inc.*, the Court of Claims described two basic tests that had developed in the application of step transaction principles. There are real differences between the tests. Both, however, apply the central purpose to assure that tax consequences turn on the substance of a trans-

**19.** An analysis in detail of this body of tax law is provided by the Court of Claims in *King Enterprises, Inc. v. United States*, 418 F.2d 511, 516–18, 189 Ct.Cl. 466 (1969).

**20.** *American Potash & Chemical Corp. v. United States*, 399 F.2d 194, 202, 185 Ct.Cl. 161 (1968); *Commissioner v. Ashland Oil & Refining Co.*, 99 F.2d 588 (6th Cir.1938).

**21.** Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, p. 18 (1966).

**22.** *King Enterprises, Inc.*, 418 F.2d at 516 (citing Mintz and Plumb, Step Transactions, pp. 247, 252–53 (1954)).

action rather than on its form. The "interdependence test" looks objectively at whether the "steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series."[23] The "end result test" states that "purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result."[24]

The facts of this case do not delineate steps so interdependent that the legal relations created by one transaction were fruitless until completion of the series. The individual portions of the Library had commercial value to each party. Hearst licensed the footage it continued to possess during the period 1981–85; UCLA started its licensing program in 1984 on the materials it had received. Hearst used footage from undelivered portions of the Library for inclusion in its own programming. Hearst could have refused, without legal penalty, to make one or more of the second, third, or fourth deliveries. In such event, however, the steps already taken would not have been commercially fruitless. UCLA could have licensed the portions it in fact received.

The step transaction doctrine is not restricted to situations where the parties have a binding commitment to take steps remaining after the first step. "The doctrine derives its vitality, rather, from its application where the form of a transaction does not require a particular further step be taken; but, once taken, the substance of the transaction reveals that the ultimate result was intended from the outset."[25]

At all times, Hearst fully intended to keep the Library intact and to donate the entire Library to one donee. From the inception of the idea to donate, in mid–1978, Hearst only entertained ideas of contributing the entire Library to one institution. Hearst was not interested in the National Archives offer to accept a donation of the Library as long as they could "pick and choose" which nitrate outtakes it desired. The King Features officials were thinking only in giving the Library in its entirety, because if the gift were subject to a selection process "what would be left would be worthless to anyone."

The documentary structure for the donation in four portions—four Board resolutions, four gift instruments from Hearst, and four acceptances by the Regents—embodies in stylized terms conventional legal safeguards that had been crafted by counsel to maximize tax benefits. They defined four portions of property and created a legal posture that would permit contingencies neither Hearst's Board nor the Regents ever expected to mature. Neither party intended nor anticipated the donation's scope would be limited to property already transferred, nor that the defined legal rights would be invoked. In fact, the entire Library was transferred, and the legal relationships created in the documents were never invoked by the parties.

At no time was there concern that less than the entire Library would be transferred. Hearst's Board did not reexamine the burgeoning markets the valuation experts now describe and consider whether to withhold some or all of the portions in the remaining steps so as to take advantage of the changing television market for film program product.

On the basis of the operative facts, both the donor and the donee intended the donation to be a gift of the entire Library. The entire Library was contributed, and that contribution is one gift. It should be valued at the last time it was a whole proper-

**23.** *King Enterprises, Inc.,* 418 F.2d at 516 (quoting Paul and Zimet, Step Transactions, Selected Studies in Federal Taxation, p. 200, 254 (2d Series, 1938)).

**24.** *Id.* (quoting Herwitz, Business Planning, p. 804 (1966)).

**25.** *King Enterprises, Inc.,* 418 F.2d at 518 (citing *Anheuser–Busch, Inc. v. Helvering,* 40 B.T.A. 1100 (1939), *aff'd,* 115 F.2d 662 (8th Cir.1940)).

ty, in 1981.[26] From the inception of the idea of donating the Library, and throughout its execution, Hearst intended the ultimate result of contributing the entire Library to one donee. Substance is favored over form, and the factual nexus makes application of the step transaction doctrine appropriate. The valuation date is the date of the Regents' first acceptance letter and the Library's fair market value is to be determined as of December 2, 1981.

*Fair Market Value*

■ Charitable contribution tax cases characteristically present a battle of experts on the issue of the fair market value of the donated property. As is typical in litigation that involves battles by experts in analysis of complex matters, the information provided by the valuation witnesses of both parties was skewed to advance the objectives of their respective clients. Plaintiff's expert witnesses resolved valuation issues so as to maximize the dollar value of the contribution; defendant's witnesses, on the other hand, attempted to satisfy IRS and Department of Justice interests to minimize the allowable deduction. These recognized but seldom articulated characteristics are manifest in the record of this case.

Each party vigorously attacked the credibility of the opponent's experts and their opinion analyses. Both have reasonable support for the challenges. As a result, although each of the valuation witnesses testified forthrightly and provided information and analysis well within the scope of discretionary bounds on valuation issues, their recommendations as to dollar values must be viewed with substantial skepticism to correct for pro-client bias.

The disparity in the fair market values produced by the appraisal experts for the property in this case is remarkable. In 1981, Hearst received an appraisal from the American Appraisal Company that valued the Library at $62 million, and this amount was the basis for Hearst's income tax returns, and its claims to the IRS for refunds, for the years in dispute. In January 1985, Hearst submitted to the IRS appeals officer an appraisal by Marshall and Stevens, Inc. that valued the Library as of October 31, 1981, at $50.5 million. Neither the theory used, nor the calculations involved, in these appraisals are presented in the record. On the basis of reconsideration and re-evaluation, Hearst at trial presented two appraisals completed in 1991. The Price Waterhouse report (Grabowski report) dated September 30, 1991, on the basis of the income a buyer could expect to generate from commercial exploitation of the Library, calculated a total fair market value of $22.9 million. The report of Harrison, Bond & Pecaro (Bond report) dated October 11, 1991, on the basis of the market approach, determined a total fair market value of $35.1 million.[27]

The IRS recognized fair market values that totaled $1.8 million for the relevant years, and on audit in 1985 apparently reached a total value of $2 million. The calculations on which these values were based, however, are not shown in the record. At trial, defendant presented a report, dated September 17, 1991, prepared by the American Valuation Group, Inc. (Spiro report) that on the basis of an income approach calculated a total fair market value of $1.9 million. At trial and in posttrial briefing, the total value of the Library property according to defendant's expert was $1.4 million.

At trial, the witnesses who testified as authors of the valuation reports were recognized under Federal Rule of Evidence 702 as experts: James R. Bond[28] and Rog-

---

**26.** Defendant would make the valuation date Nov. 30, 1981, the date of Hearst's gift instrument. The dates of the documents in the structured delivery are virtually contemporaneous, and any differences are de minimis.

**27.** Hearst's tax manager in 1980 had valued the Library at $30 million ($1 per foot) or $15 million ($0.50 per foot) and the Board on Dec.

10, 1980, used information that placed the value at $29.4 million or $14.7 million.

**28.** Mr. Bond is experienced in appraising radio, television, and cable television properties. He is not a member of the American Society of Appraisers (ASA); he was recognized as an expert in asset valuation and valuation of media properties.

er J. Grabowski[29] for plaintiff, and Herbert T. Spiro[30] for defendant. A trial judge is afforded a broad discretion in determining whether an expert is qualified to testify, and has broad authority to accept, reject, or modify the testimony of expert witnesses. The principle that admission of expert testimony is within the discretion of the trial court is well established in the Federal Circuit.[31] A decision to exclude such proffered testimony is subject to review only for abuse of discretion.[32] It is generally acknowledged that the trier of fact, whether judge or jury, may choose not to accept an expert opinion even if it is uncontradicted.[33]

Evidence of fair market value is largely a matter of opinion. The concept inherently involves some speculation, and the use of assumptions permits disparities in expert opinion. The Court of Claims recognized the necessity to permit speculation, noting that "[o]ne guess may be better than another guess, since not all guesses have in them the same elements of intelligence." [34] What the fair market value of property is at a given time is a question of fact to be resolved from a consideration of all of the relevant evidence in the record. Where there is a demonstrated market for an item, the proper market for valuation purposes is a question of fact.[35]

A number of techniques have been employed to arrive at a monetary equivalent to the theoretical fair market value. The traditional and most frequently employed technique, the "market data" or "comparable sales" approach uses sales and purchases of other properties that reasonably resemble the subject property with respect to time, place, and circumstance. Other techniques include the capitalization of income approach (sometimes referred to as "discounted cash flow" or the "present worth of future income"), which relates earnings that reasonably could be expected to be derived from the property, discounted for risks and other variables, to arrive at present value.

The Grabowski report defines the income approach used therein as follows:

The Income Approach is a valuation technique by which the Fair Market Value is estimated based on the cash flow an asset can be expected to generate over its remaining useful life. There are five steps in applying this approach: (1) the annual after-tax cash flows the asset will generate over its remaining useful life are estimated; (2) these cash flows are converted to their present value equivalents using a required rate of return which accounts for the relative risk of not realizing the annual cash flows and for the time value of money; (3) the residual value, if any, of the asset at the end of its remaining useful life is estimated; (4) the estimated residual value is converted to its present value equivalent; (5) the present value of the estimated after-tax cash flows is added to the present value of the residual value to obtain an estimate of the asset's Fair Market Value.

There have been six major English language newsreels: Hearst Metrotone News, Warner–Pathe Newsreel, Paramount

**29.** National Director of Price Waterhouse Valuation Services Division. Member of ASA and CREA; recognized as expert in valuation, including media properties.

**30.** Member ASA; recognized as an expert in asset valuation, valuation of businesses, including media properties.

**31.** *Acoustical Design, Inc. v. Control Electronics Co.*, 932 F.2d 939, 942 (Fed.Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991) (citing *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962)).

**32.** *Id.* (citing *Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed.Cir. 1984)).

**33.** *Sternberger v. United States*, 401 F.2d 1012, 1016, 185 Ct.Cl. 528 (1968) ("Exaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision and errors may all breed disbelief and therefore the disregard of even uncontradicted nonopinion testimony.")

**34.** *Cities Service Gas Co. v. United States*, 580 F.2d 433, 438, 217 Ct.Cl. 590 (1978).

**35.** *Anselmo v. Commissioner*, 757 F.2d 1208, 1213 (11th Cir.1985).

Newsreel, Fox Movietone Newsreel, Universal Newsreel, and British Pathe Newsreel. Transactions that involve ownership changes in these newsreels, and their condition, involve time periods and other circumstances that obstruct comparative analysis.

The Paramount and Warner–Pathe Newsreels were acquired by the Sherman Grinberg Film Library in the 1950s, and since have been located at, respectively, that library's New York and Los Angeles facilities. Maintenance at the Sherman Grinberg Film Library is questionable; soundtracks from the Warner–Pathe and Paramount Newsreels have been discarded or have deteriorated, and there has been continuous nitrate deterioration.

The National Archives Records and Administration Service acquired the Universal Newsreel by donation in the early 1970s, and it has been in the public domain since 1974. Prior to 1978, the Universal Newsreel consisted of approximately 28 million feet of film. In 1978, a fire destroyed 75 percent of approximately 12.6 million feet, of the Universal Newsreel nitrate footage taken in the 1930s–1940s. The portion of the Universal Newsreel destroyed in 1978 consisted primarily of unreleased footage. The 1978 fire also destroyed some of the edited Universal newsreels from the World War II period. The Universal Newsreel lacks sound tracks for footage covering the 1930s and some of the 1940s.

The Fox Movietone Newsreel is owned, in principal part, by Twentieth Century Fox, although one portion of that newsreel was donated to the University of South Carolina in or about 1980. The Fox Movietone Newsreel is catalogued on a card index similar to the Library's card index.

The British Pathe Newsreel Library is currently located in the United Kingdom and is owned by British Pathe News Limited. The British Pathe Newsreel is oriented to British audiences and covers events and personalities from approximately 1896 through 1970. The British Pathe Newsreel Library consists of approximately 12 million feet of 35 mm film, and approximately 7.5 to 8 million feet (67 percent) of the film is nitrate based. There are approximately 11.5 million feet of black and white film, and 500,000 feet of color film. There are approximately 3.6 million feet of silent film and 8.4 million feet of sound film. The film has a running time of approximately 2300 hours. About 56 percent of the British Pathe Newsreel Library (approximately 1300 viewing hours) is released newsfilm, and about 44 percent (approximately 1000 viewing hours) is unreleased footage.

In 1986, the British Pathe Newsreel Library was a part of the Thorn EMI Film Library; that Library in 1986 changed owners in two separate transactions. In 1987, Wientraub Entertainment Group (WEG) purchased the Thorn EMI Film Library for approximately $85 million. WEG viewed the British Pathe News collection as worth approximately $5 million. WEG owned the British Pathe collection from 1987 to 1989. Parkfield Entertainment paid $16 million in 1989 to purchase the British Pathe collection from WEG.

The Bond appraisal report notes that the small number of extant historical newsreel and film collections make sales transactions exceedingly rare. When sales do occur, the parties involved often do not disclose details of the transaction. The collections are specialized, and the types of films contained in each collection are distinctive in terms of quality, content, and scope.

The Prelinger report states it is indisputable that no real market in the commonly accepted sense existed for newsreel collections in the early 1980s. The existence of huge nitrate film collections frightened executives; escalating storage charges confounded comptrollers; and few installations could be found to assume responsibility for these collections.[36]

---

36. Richard Prelinger was designated by defendant to be called as an expert witness on film archives, and the commercial uses of stock footage. The report of Prelinger Associates, Inc., dated Oct. 7, 1991, "The Hearst Metrotone News Library at UCLA Film and Television Archives" is not an appraisal and does not provide a monetary value; it is described as a compilation of notes that focus on the characteristics of the Library of significance to an archivist and film

*Bond Report*

The market approach was utilized, with calculations adjusted through weighted elements to account for differences in transfers of selected properties in quality, content, and scope. Mr. Bond identified ten sales transactions of film and newsreel collections that occurred between 1972 and 1989, and selected six as comparable to the Library contribution. The transactions surveyed and selected are shown in the following table:

TRANSACTIONS

| Collection Total Ft./Price | Sale Date | Purchaser | Sale Date Price/Ft. |
|---|---|---|---|
| *Holt Collection (3,765'/$5,000) | 1972 | Library of Congress | $1.33 |
| Eastman Collection (3,402,900'/$985,780) | 1978 | Insurance Settlement | 0.26 |
| *Axelbank Collection (205,920'/$130,000) | 1979 | Hoover Institute | 0.63 |
| Freud Film (320'/$2,600) | 1983 | Chicago Institute | 8.13 |
| *Freud Film (320'/$1,000) | 1983 | Library of Congress | 3.13 |
| Baker Collection (1,000,000'/$200,000) | 1984 | Kansas City, Missouri | 0.20 |
| *Kanter Collection (200,000'/$249,210) | 1986 | University of Oklahoma | 1.25 |
| Wright Collection (710,800'/$11,500) | 1988 | Library of Congress | 0.02 |
| *Palmer Collection (82,000'/$82,000) | 1988 | Maritime Museum | 1.00 |
| *British Pathe Collection (12,000,000/$16,000,000) | 1989 | Parkfield Group PLC | 1.33 |

* Selected as comparable

---

The Holt collection is 3,765 feet of silent, 35 mm, black and white, nitrate film. These foreign and American documentaries and short subjects were shot between 1894 and 1905 and were sold to the Library of Congress for $5,000 in 1972.

The Axelbank collection consists of 205,-920 feet of mostly 35 mm, black and white, silent acetate film depicting Russia and the Soviet Union from 1900 through the 1970s. The Hoover Institute acquired the collection in 1979 for $130,000.

The Library of Congress purchased a copy of the Freud film for $1,000 in 1983. This 320 foot black and white, silent film portrays Freud, his family, students, and colleagues.

The University of Oklahoma bought the Kanter collection in 1986 for $249,210. This collection is 200,000 feet of 16 mm, sound, black and white, and color film of 5,000 political commercials.

The Palmer collection includes 82,000 feet of documentaries on ships and sea trade filmed during 1938 through 1984. The National Maritime Museum purchased this 16 mm color film for $82,000 in 1988.

The British Pathe collection is newsreel footage. Its characteristics have been described above.

research consultant. Richard Prelinger was not called as a witness by defendant. The Prelinger report, made for the Department of Justice, was offered by plaintiff and admitted in evidence.

Mr. Bond performed a complex statistical analysis of the six transactions selected that was designed to adjust for the much smaller quantities that were present in the selected companies than in the Library, and for differences in time, content, and quality, in order to derive a price per foot for the Library portions that were accepted by the Regents on four dates: December 2, 1981; March 8, 1982; February 5, 1985; and November 19, 1985. The statistical analysis determined that there was no relationship between the price per foot paid and the overall collection size, and that there was a high correlation between the total price paid for a collection and the total size of the collection.

Mr. Bond found a price multiple for each of the six transactions he considered to be comparable by dividing the price by the number of feet. He then adjusted the price multiple to each of four valuation dates using the Consumer Price Index (CPI) for Entertainment Services.[37] These adjustments were:

Adjusted Price Multiples for Valuation Dates

| Sale Date | Comparable | 12/81 Adjusted Price Multiple | 03/82 Adjusted Price Multiple | 02/85 Adjusted Price Multiple | 11/85 Adjusted Price Multiple |
|---|---|---|---|---|---|
| —/72 | Holt Collection | $2.27 | $2.32 | $2.71 | $2.82 |
| 11/79 | Axelbank Collection | .73 | .75 | .88 | .91 |
| 07/83 | Freud Film | 2.85 | 2.90 | 3.40 | 3.53 |
| 01/86 | Kanter Collection | 1.00 | 1.02 | 1.19 | 1.24 |
| 07/88 | Palmer Collection | 0.71 | 0.73 | 0.85 | 0.88 |
| 10/89 | British Pathe Collection | 0.88 | 0.90 | 1.05 | 1.09 |

In order to arrive at a composite price multiple that would reflect the proper multiple for the Library, the statistical analysis assigned a weight to each of the collections based on their degree of comparability to the Library. The weight was derived by examination of seven criteria and an allocation of points to each: (1) subject content (50 points), (2) amount of black and white versus color film (5 points), (3) amount of sound versus silent film (5 points), (4) amount of 16 mm versus 35 mm film (5 points), (5) amount of nitrate versus acetate film (5 points), (6) existence of a copyright for the collection (20 points), and (7) existence of a film catalogue (10 points). For each of the seven criteria, Mr. Bond subjectively assigned points to each of the six collections that were based on his perceived similarity to the Library collection. The total number of points for each collection was computed and a weight was derived by dividing the points for each individual collection by the total points given to all collections. This calculation produced the following weighted factor for each collection:

---

**37.** The parties agree that the Consumer Price Index does not measure the changes in costs of film in the Library.

## WEIGHTED FACTOR CALCULATION

| Sale Date | Description | Total Points | Weighted Factor | Rounded |
|---|---|---|---|---|
| —/72 | Holt Collection | 30 | 13.4 | 15 |
| 11/79 | Axelbank Collection | 25 | 11.1 | 10 |
| 07/83 | Freud Film | 10 | 4.5 | 5 |
| 01/86 | Kanter Collection | 27 | 12 | 10 |
| 07/88 | Palmer Collection | 35 | 15.6 | 15 |
| 10/89 | British Pathe | 97.5 | 43.5 | 45 |
| TOTAL | | 224.5 | 100.1 | 100 |

An adjusted price per foot for each collection was derived by applying the rounded weighted factor as a percentage of the CPI adjusted price per foot. The total of the weighted adjusted price per foot for each collection produced an adjusted valuation per foot for the Library portions accepted on the four valuation dates.

| Sale Date | Description | 12/1981 Weighted Adjusted Pr./Ft. | 03/1982 Weighted Adjusted Pr./Ft. | 02/1985 Weighted Adjusted Pr./Ft. | 11/1985 Weighted Adjusted Pr./Ft. |
|---|---|---|---|---|---|
| —/72 | Holt Collection | 0.34 | 0.35 | 0.41 | 0.42 |
| 11/79 | Axelbank Collection | 0.07 | 0.08 | 0.09 | 0.09 |
| 07/83 | Freud Film | 0.14 | 0.15 | 0.17 | 0.18 |
| 01/86 | Kanter Collection | 0.10 | 0.10 | 0.12 | 0.12 |
| 07/88 | Palmer Collection | 0.11 | 0.11 | 0.13 | 0.13 |
| 10/89 | British Pathe Collection | 0.40 | 0.41 | 0.47 | 0.49 |
| | Val./ft. | 1.16 | 1.20 | 1.39 | 1.43 |

The weighted price multiple was rounded to the nearest $0.05. As rounded, the valuation price per foot for the Library on the acceptance dates was:

| Valuation Date | Weighted Adjusted Price per Foot |
|---|---|
| December 2, 1981 | $1.15 |
| March 8, 1982 | $1.20 |
| February 5, 1985 | $1.40 |
| November 19, 1985 | $1.45 |

This composite weighted price per foot multiplied by the number of feet of film donated on each date yields a total fair market value of $35,066,956. The valuation as of each acceptance date was:

| Valuation Date | Total Footage | Value Per Foot | Appraised Value |
|---|---|---|---|
| December 2, 1981 | 9,531,964 | $1.15 | $10,961,759 |
| March 8, 1982 | 4,264,888 | $1.20 | $ 5,117,866 |
| February 5, 1985 | 6,040,824 | $1.40 | $ 8,457,154 |
| November 19, 1985 | 7,262,191 | $1.45 | $10,530,177 |
| Total | 27,099,867 * | | $35,066,956 |

* This total is less than the amount of footage stipulated by the parties. The amount of footage by types of Library property on the dates accepted by the Regents (see Appendix) also stipulated, totals 27,117,047 feet. Court Exhibit 12, produced by plaintiff September 15, 1992, shows the following footages: Dec. 1981—9,541,000 ft.; March 1982—4,274,000 ft.; Feb. 1985—6,042,000 ft.; Nov. 1985—7,262,000 ft. Total—27,119,000 ft.

---

The sophisticated statistical analysis in the Bond report is an interesting intellectual exercise. The market approach, however, has serious deficiencies on the facts that prevail in the Library donation. There have been only six major newsreel collections in the English language, and accordingly, there have been few sales or transfers of newsreel and historical film collections. There is only a minimal number of possible comparable market transactions. Many transfers of these collections have been in donations to educational institutions rather than a transaction in a commercial market. One measure of comparability in the Bond report was the presence of an arms length commercial transaction. As a result, transfers that involved insurance settlements, IRS claim settlements, extraordinary premiums paid for a specialized interest, or multiple copyrights were excluded.[38]

The Bond report's selection of comparable sales is seriously flawed. The transactions identified for comparison to the donation of the Library on November 30, 1981, lack comparability due to differences in time, in size, and in scope. Selection of the Sigmund Freud film is the most obvious noncomparable transaction. This film was a portrayal of a single person and was produced for personal use, unlike the other collections which were commercially oriented. The Library of Congress purchased a copy of the original Freud film, unlike the buyers in the other "comparable sales" that bought the original film. In addition, the Freud film is one item, and it consists of only approximately 320 feet of film. It is not even remotely comparable to a collection of films depicting news events of the early twentieth century.

According to the Bond report, the Holt collection contains news, early documentary, and other short subject films. Closer examination of this collection reveals that its contents are not comparable to that of the Library. The Holt collection is a specialized collection of motion pictures, consisting of approximately 3,765 feet of nitrate film, produced in the period between 1894 and 1905, by the inventor of motion pictures, Thomas A. Edison. Many trick photography and dance subjects are included in this collection. The Holt collection's only similarity to the Library property is that it contains early films. Early films are only a small part of the Library. The sale of the early films covering a 10–year span in the Holt collection is not comparable to the transfer of a newsreel collection spanning decades.

British Pathe News collection is a newsreel collection and as such could be a comparable sale. The Axelbank collection arguably may be comparable to the Library

38. Eastman Collection—$0.26 per foot; Freud Film to Chicago Institute—$8.13 per foot; Baker Collection—$0.20 per foot; Wright Collection—$0.02 per foot. In 1970, MCA donated the Universal newsreels to the National Archives. The IRS and MCA, according to the Bond report, settled the claim for a charitable contribution deduction for $6 million, which amounts to approximately $0.35 per foot.

because it consists of newsreels concerning Russia. The Palmer and Kanter collections, although they are not in a newsreel format, contain topics which also may be present in the Library.

Without the Freud and Holt collections, the Bond report loses credibility. A comparison of only four sales, three of which occurred after the Hearst donation in 1981, does not yield an accurate view of the Library's fair market value.

The Bond report gives 75 percent of the weight to post-donation sales: Freud film— 5 percent; Kanter collection—10 percent; Palmer collection—15 percent; British Pathe—45 percent. Plaintiff relies on *Krapf v. United States* [39] to support a contention that post-transaction events have probative value. In *Krapf,* the plaintiff attempted to determine the fair market value of donated stock by looking at post-donation sales of that same stock. The Federal Circuit held that:

> Evidence of post-transaction events may or may not be relevant depending on what events are sought to be proved. Where there was a series of arms length sales at the same price before and after the donation, such evidence might well give rise to an inference that the gift had the same value and, thus, would be admissible. [E]ven if relevant, the evidence may have little probative value.[40]

A sale after the valuation date "has probative force bearing on the value as of the earlier critical date—where there has been no material change of conditions or circumstances in the interim."[41]

In this case, unlike the situation that occurred in *Krapf,* there was not a series of sales of the same asset, the Library. The Freud and Holt collections are not comparable and therefore have no probative value. The exclusion of the Holt collection leaves only one pre-donation transaction. This is not a "series."

In 1989, the British Pathe collection differed from the Library property in 1981, and market conditions had changed extensively. Although a 1981 sale of British Pathe could be relevant because it is a newsreel collection, as is the Library, it would not be probative of the Library's fair market value under the market approach even if there had been no material change in the market conditions. The existence of only one truly comparable sale does not provide an adequate market approach analysis.[42]

The "weighting formula" utilized in the Bond report produces a distorted result because of the inclusion of clearly noncomparable transactions (Holt collection and Sigmund Freud film) and considers the 1989 British Pathe transaction without appropriate adjustments. The "statistical analysis" in the Bond report has minimal value since the properties included in the analysis are not comparable to the Library property at issue.

The Bond report relies on noncomparable sales and overlooks the limitations of the market approach on the facts extant in this case. The Bond report, therefore, is rejected as not probative of the Library's fair market value.

### Grabowski Report

The capitalization of income approach was utilized to estimate the fair market value of the entire Library at each of the following dates: December 2, 1981; March 8, 1982; February 5, 1985; and November 19, 1985. Fair market values were based on the present value of income estimated to be generated over a 15–year period from: (1) producing original programming for television, (2) producing documentaries for the home video market, and (3) licensing

**39.** 977 F.2d 1454 (Fed.Cir.1992).

**40.** *Krapf v. United States,* 977 F.2d at 1459. *Krapf* also involved a situation where the IRS disallowance was on the ground that the contribution had no value.

**41.** *Estate of Ridgely v. United States,* 180 Ct.Cl. 1220, 1237 (1967).

**42.** *See American Indians Residing on Maricopa–Ak Chin Reservation v. United States,* 667 F.2d 980, 995–96, 229 Ct.Cl. 167 (1981) (the court rejected a report with a sample of 19 comparable properties because it was a limited number which reduced the accuracy of the expert's fair market value determination).

footage in the stock/archival market. A value for a foot of film was derived by dividing the value for the entire Library by the total Library film footage (27,099,867 ft.). The per foot values then were applied to an estimated amount of footage transferred on each donation date. These values are shown in the following tables:

| Date | Discounted Income Stream | Fair Market Value Total Library * | Value Per Foot of Film |
|---|---|---|---|
| December 2, 1981 | $16,895,961 | $17,000,000 | $ .63 |
| March 8, 1982 | 16,910,488 | 17,000,000 | $ .63 |
| February 5, 1985 | 28,544,031 | 29,000,000 | $1.07 |
| November 19, 1985 | 28,827,003 | 29,000,000 | $1.07 |

* Rounded

| Date | Footage | Value Per Foot of Film | Value of Donation |
|---|---|---|---|
| December 2, 1981 | 9,531,964 | $ .63 | $ 6,005,137 |
| March 8, 1982 | 4,264,888 | $ .63 | 2,686,879 |
| February 5, 1985 | 6,040,824 | $1.07 | 6,463,682 |
| November 19, 1985 | 7,262,191 | $1.07 | 7,770,544 |
| TOTAL | 27,099,867* | | $22,926,242 |

* This total is less than the amount of footage stipulated by the parties. The amount of footage by types of Library property on the dates accepted by the Regents (see Appendix) also stipulated, totals 27,117,047 ft. Court Exhibit 12, produced by plaintiff September 15, 1992, shows the following footages: Dec. 1981—9,541,000 ft.; March 1982—4,274,000 ft.; Feb. 1985—6,042,000 ft.; Nov. 1985—7,262,000 ft. Total—27,119,000 ft.

---

Cash flows in the Grabowski report were projected on 15 year periods that began on the four transfer dates. The period for the 1981 tax year was 29 days ended 12/31/81, to December 31, 1996; for the 1982 tax year the period was 298 days ended 12/31/82, to December 31, 1996; for the 1984 tax year the period was 329 days ended 12/31/85 to December 31, 1999; and for the 1985 tax year the period was 42 days ended 12/31/85 to December 31, 2000. As supporting background for the income analysis, the Grabowski report includes a comprehensive market analysis of the cable, network broadcast and satellite television industries for the period 1970s through 1981, an analysis of expectations in the mid–1980s for the period 1985–90, and a recital of actual results during that period.

Inasmuch as application of the step transaction doctrine determined that the valuation date for the Hearst contribution was December 2, 1981, the Grabowski report's fair market values for March 8, 1982, February 5, 1985, and November 19, 1985, are not relevant. Similarly, market factors that bear upon production of original programming, production of documentaries for the home video market, and the licensing of film for the stock footage/archival market, are limited to information available on December 2, 1981, and market developments foreseeable on that date. Accordingly, market factors discussed for the period 1970s through 1981 are those that are relevant to a determination of what a donor or a prospective purchaser could develop as a concept of ways the Library property could be exploited commercially.

Market analysis in the Grabowski report included among other items an examination of cable and pay TV revenue, number and percentage of U.S. homes wired for cable TV, average number of TV channels per

home, basic cable subscriber growth, growth in video cassette recorder (VCR) households, video retail outlets, and sales of rerecorded video cassettes.

For the period ending December 2, 1981, the market analysis showed:

Between 1975 through 1981, the number of basic cable subscribers in the United States grew from approximately 9.8 million to approximately 23 million.

Between 1975 and 1981, the number of United States television homes grew from approximately 68.5 million to approximately 79.9 million.

Between 1975 and 1981, the number of United States homes passed for cable television (i.e., homes to which cable television is available for subscription) grew from 21.8 million to 41.8 million.

Between 1975 and 1981, the average number of television channels per United States home grew from 7 to 10.4, and the number of local operating systems carrying more than 12 channels grew.

During the late 1970s, the launching of communication satellites with transponders enabled local United States cable stations inexpensively to receive signals from distant broadcast stations and thus offer more channels to viewers.

Between 1975 and 1981, United States cable and pay television revenues grew from an estimated $900 million to an estimated $3 billion.

By 1981 the increasing number of United States television stations created an increasing demand for television programming to fill up those channels.

VCRs for household use first appeared in the United States in or about 1975. VCR sales were not significant in the 1970s. VCRs were purchased by only a narrow demographic segment, mainly due to the high cost of the units.

The number of VCRs in the United States grew from approximately 400,000 in 1978 to approximately 1.7 million in 1980. Sales of prerecorded video cassettes (sell through sales) in the United States were approximately $40 million in 1978, and grew to $119 million by 1980.

By the middle of 1981, the number of VCRs in the United States was predicted to reach between 2.9 million to 3.2 million by the end of that year. Sell through sales were predicted to grow to $250 million by 1981.

The core of the Grabowski report is the calculations for cash flow that were estimated to result from using the Library property in the three selected markets. Each cash flow projection involved a series of assumptions relating to generation of income and applicable expenses that an owner of the Library would make in order to exploit those markets. The assumptions and estimates reflect market conditions that had developed by 1990 and were expected to develop in the succeeding 5–year period.

1. The cash flow from production of original programming for television assumed:

—the owner would computerize the index cards in the first 6 months, at a cost of $300,000;

—production of 10 hours of original programming per year in one hour segments for 5 years solely from Library footage; after 5 years, 10 percent of the programming would be from licenses of footage from supplementary sources;

—U.S. revenues from programming were based on estimates of $50,000 per hour in 1990, and assumed a cycle for broadcast TV and a cycle for cable TV; years prior to 1990 were adjusted on the basis of cost data that had been published from 1985 to 1989; years after 1990 assumed a 7 percent growth rate;

—total revenue included revenue from TV markets outside the U.S. and assumed an 80 percent capture in the "early 1980s" and gradually declining to 60 percent thereafter; outside U.S. revenues were derived by extrapolating these percentages on domestic revenues;

—revenues from rerelease of prior production assumed a rerelease every fourth year;

—expenses included production costs with no allowance for distribution costs; production costs were estimated at $50,-

000 in 1990; for years prior and after 1990, production costs were estimated to increase at the same rate as revenue;

—costs of licenses of footages from supplementary sources were based on estimates of $2,700 per minute in 1990, with an increase of 7 percent per year for inflation;

—production of programming for TV was marginally profitable, but rerelease and ancillary (home video) markets were expected to provide profit for each new program.

2. The cash flow from production of documentaries on video cassettes assumed:

—production of 10 video cassette titles, each one hour duration, released each year; after 5 years, footage would be licensed from supplementary sources;

—sales in U.S. and Canada of 25,000 units on initial release of each new title in 1986; new titles released before 1986, an initial sale of 25,000 to be realized over first few years;

—unit sales per initial title released estimated at:

> 1986—25,000
>
> 1987—30,000
>
> 1988—40,000
>
> 1989—50,000

—after initial release, number sold would decrease rapidly; projected an initial release period of 5 years, offmarket for 2 years, then rereleased for another 5 year cycle; rerelease volume per title estimated to be one-third of volume of a new title in each rerelease year;

—worldwide sales from mid–1980s through 1989, estimated on basis that U.S. and Canada sales were 65 percent of the world market; revenues from sources outside U.S.–Canada were derived by extrapolating this percentage on domestic revenues;

—each year 1992–96, projected that titles could be released on such new video media (unidentified) as may be developed:

> 1992—368,000 units
>
> 1993—576,640 units
>
> 1994—328,525 units
>
> 1995—232,974 units
>
> 1996—238,388 units

—margin generated from production for each video cassette sale would be 30 percent of the retail price per title; $57.38 for 1981, 1982 and 1983, $38.99 for 1984, and $30.06 for 1985, and $19.95 for the period 1989–96;

—additional production costs were not included since production expenses had been absorbed in production of programs for television;

—the license fee paid to other stock/archival footage libraries would be $2,700 per minute in 1990, which would increase by 7 percent per year for inflation.

3. The cash flow from licensing stock/archival footage assumed:

—on the basis of UCLA experience and UCLA agreements with licensees after 1985, licensor would get a royalty payment from each production for film footage actually used in finished product;

—revenues computed on a 15–year projection period, with a rate of growth of 17 percent in first year, diminishing to 7 percent in 1987–96 years;

—normal film preservation costs, incurred annually were estimated at 6.3 percent to 5.4 percent from 1981–84, and at 5.1 percent for each year in period 1985–96; total preservation costs for period 1981–96 were estimated at $738,673;

—licensee would pay costs of transferring Library material to tape, including laboratory charges, processing fees, library preparation fees, etc.

The Grabowski report calculations for the estimated fair market value of the Library included the following steps.

1. Add the estimated cash flows, before income taxes, for the three selected markets to determine Total Cash Flow.

2. Subtract amortization of the Library (a non-cash expense), calculated as a percentage of total cash flow before

income taxes for each year of the 15–year period, to obtain Taxable Income.

3. Subtract combined state and federal income taxes, using a 50 percent rate, adjusted for investment tax credit for producing original programming.

4. Add back amortization to obtain total cash flow for each year, to obtain Total Cash Flows after income taxes.

5. Convert each of the cash flows to present value equivalents by a weighted average rate of return of 20 percent for production of original programming and a weighted average rate of return of 15 percent for licensing stock/archival footage.

6. Add present value of cash flows beyond the 15–year period (residual value), obtained by capitalizing cash flows expected in the 16th year.

The present value of the residual in the December 2, 1981, calculation was $2,737,164. The total cash flows, before income taxes, for the December 2, 1981, calculation from the three selected markets was $100,122,753; the cash flow (before income taxes) from producing original programming for television accounted for 1.28 percent; the cash flow (before income taxes) from producing documentaries on video cassettes accounted for 90.36 percent; and the cash flow (before income taxes) from licensing stock/archival footage accounted for 8.36 percent.

The accuracy and utility of the income approach as a technique to estimate fair market value are dependent upon the validity of the assumptions on which the calculations are based. The final conclusions of the Grabowski report on fair market values are the product of highly speculative and optimistic assumptions that maximized each step in the calculations. The techniques employed in the Grabowski report, and its careful delineation of the many elements used in application of the income approach, reflect recognized professional appraisal standards; the report, however, is flawed in the assumptions employed.

The Grabowski report, completed in September 1991, presents analyses of data for the TV market during the 1980s, a period of extraordinary growth and changes. The cash flows in the report embody projections that reflect trends, some of which were nascent in the 1970s but which were not generally recognized at that time. Actual developments in the 1980–90 period exceeded expectations of the 1970s, and make the Grabowski report's projections appear to be reasonable. The only relevant consideration, however, is the state of the market and the expectations of Hearst's Board and of the Regents in December 1981. The report's emphasis on market data for the 1985–91 period is in error; only market information that was available in December 1981, has utility for cash flow projections in income approach for valuation of this 1981 charitable contribution.

In December 1981, the Library consisted of millions of feet of film that was in storage, together with related memorabilia that no longer were a part of Hearst's ongoing business. Storage conditions were those suitable for materials for which little present or future value was perceived, and the related nonfilm items represented the residue of natural accumulations of items for which retention no longer had a business justification.

Hearst Metrotone News had stopped production of News of the Day in 1967. From 1954 through 1969, and from 1971 through 1975, Hearst Metrotone News had operated at a loss. Profits from 1976 through 1981 were from services and features for television broadcast, and much of this material was embodied in the derivative works excluded from the contribution. Revenues from stock footage sales of Library film, the only viable source of income from the property, produced net profits of $17,847, $14,008, $54,629 and $21,543 in 1978, 1979, 1980, and 1981 respectively. Clearly, Hearst's Board did not anticipate the television market changes on which the Grabowski report raises its cash flows. Even in 1985, these changes were not sufficiently apparent to cause Hearst to exercise its legally reserved position and decline to make the last two deliveries. It is not credible that Hearst, with its experience and investments in the TV business would

dispose of an asset that it recognized had value as a primary source of broadcast TV or cable TV programming.

Defendant asserts that the "sell-through" video cassette market for documentary type films did not exist in 1982, and could not have been a base for a future income stream. Defendant defines the "sell-through" video cassette market as one where the product is available at a selling price per tape of approximately $14.99. The Grabowski report recognizes that the decline in selling price had significant effects on volumes sold, and calculated its cash flow on the basis of a decline from $57.38 in 1981 to a constant selling price of $19.95 per tape for the period 1989–96.

Defendant points out that since sales of video cassettes in the "sell-through" market produce by far the largest cash flow, the report's errors in market analysis are magnified. If the Grabowski report's estimates of projected video cassette sales were reduced 75 percent, defendant calculates, the estimated value of the property at issue would be $4.2 million.

As late as December 31, 1985, the top 50 best selling home video tapes were restricted to feature films, cartoons, health workouts, and pornographic films. Historical documentaries were not represented. Although it appears that a "sell-through" video market did exist at the December 1981 valuation date, there is little evidence demonstrating that there was a demand for programs produced from newsreels. A demand for programming does not translate into a demand for programming created from newsreel footage. The assumption that the Library would provide a source for constant production of ten one-hour programs suitable for the sell-through video cassette market perhaps is the most speculative assumption in the Grabowski report. Plaintiff points to the success of "Victory at Sea" and "World at War" as examples of the popularity of programs utilizing newsreels. However, evidence of only two prosperous programs does not suffice to show a healthy demand for such programs.

The Grabowski report also includes revenue from foreign markets as part of the cash flow estimates for the television and video cassette markets. There is no showing that there was a foreign demand for programming produced from United States newsreels.

Because of the presence of nitrate based film in the Library, the Grabowski report takes preservation expenses into account. Nitrate base film stock is highly flammable, potentially explosive, subject to shrinkage, decomposition, and ultimately to disintegration. The presence of nitrate film in the Library was a matter of continuing concern to Hearst management. The December 10, 1980, materials to the Board noted that the estimated cost of converting nitrate film to safety film was $3.5 million. This was an expenditure that Hearst did not think was warranted by the revenue potential from the Library.

The allowance for costs of preservation of the nitrate film in the Library made in the Grabowski report do not reflect industry standards relative to such material. The Grabowski report's preservation expenses were a total of $738,653 for the entire 1981–96 period. It did not approach the costs that Hearst considered would be required. As of May 25, 1988, UCLA apparently had converted 500,000 feet of nitrate. Lab costs alone on this volume amounted to $500,000. This per foot cost would make the cost of converting the stipulated footage of nitrate film amount to more than $10.2 million.

The Grabowski report is flawed due to assumptions that render the cash flow projections "blue sky" speculation. The Grabowski report, therefore, is rejected as not probative of the Library's fair market value.

*Spiro Report*

The income approach was used to estimate a fair market value of the entire Library on each of the dates Hearst authorized the transfer of part of the Library property: November 30, 1981; February 4, 1982; December 12, 1984; and September

18, 1985.[43] Discounted cash flows were calculated on the basis of projections for 10 years that began on the transfer dates of revenues that would be generated by operating as a commercial stock shot library. Income stream projections and the discount rate changed on the basis of the starting dates. The fair market value of the entire Library as of each transfer date was apportioned by applying the percentage of the total Library film footage that was transferred on that date. These values are shown on the following table:

| Date | Feet Transferred | Percentage of Library Total | Present Value Entire Library | Value of Portion Transferred |
|---|---|---|---|---|
| November 30, 1981 | 9,540,644 | 35.2 | $1,350,194 | $ 475,268 |
| February 4, 1982 | 4,273,388 | 15.8 | $1,302,821 | $ 205,846 |
| December 12, 1984 | 6,040,824 | 22.3 | $2,225,412 | $ 496,267 |
| September 18, 1985 | 7,262,191 | 26.8 | $2,548,336 | $ 682,954 |
| TOTAL | 27,117,047 | 100.1 | | $1,860,335 |

The 10 year period for the valuation of November 30, 1981, was 1982–91, and the discount rate was 24 percent; for the February 4, 1982, valuation the period was 1982–91, and the discount rate was 25 percent; for the December 12, 1984, valuation the period was 1985–1994, and the discount rate was 23 percent; for the September 18, 1985, valuation the period was 1986–95, and the discount rate was 22 percent. Inasmuch as application of the step transaction doctrine determined that the valuation date for the Hearst contribution was December 2, 1981, the Spiro report's overall present values of the entire Library on February 4, 1982, December 12, 1984, and September 18, 1985, are not relevant.

At trial and in posttrial briefing, defendant argues that the fair market value of the Library property is $1,350,194, which is the amount the Spiro report calculated for November 30, 1981. Although defendant asserts the Spiro report calculation is a fair market value determination, defendant does not contend that valuation is correct, or that Hearst's income taxes should be adjusted to reflect a value that is less than the amount already allowed by the IRS as a charitable contribution. Defendant uses the Spiro report as support for its claim that no refund is owed because the IRS allowance has not been shown to be incorrect.

The Spiro report utilized the income approach to valuation as the most appropriate method to find the value of a business concern or of income producing property. On the basis of an examination of Hearst's and UCLA's experience in licensing film footage, the report concluded that the most likely way to generate commercial revenue was to operate the collection by licensing stock shot footage. The discount rate used in determining present value was defined as a potential investor's minimum required rate of return, and was calculated on the basis of the return on a 30–year Treasury bond on the valuation date, plus 11 percent to cover risk premiums.

To establish a set of operating assumptions, the Spiro report examined four scenarios of alternative courses of action. These scenarios assumed that 50 percent of the collection (14 million feet) was on ni-

43. Nov. 30, 1981, is the date of Hearst's trans-

mittal letter; the other dates are of Hearst's

trate stock.[44]

Scenario No. 1. The entire nitrate portion of the collection is transferred to safety stock and the nitrate negatives and positives are then discarded; and the entire collection is transferred to video tape.

Scenario No. 2. The nitrate portions are transferred to safety stock and then discarded; only specific footage which is requested by customers is transferred to video.

Scenario No. 3. There is no transfer from nitrate to safety stock, but the entire collection is transferred to video tape.

Scenario No. 4. There is no transfer of nitrate to safety stock and no transfer of any footage to video.

Nitrate conversion costs were calculated on an estimate of $3.5 million, to be spread over a 5–year period. Video transfer costs were calculated as $0.1488 per foot, spread over a 5–year period. In the discounted cash flow analyses of the four scenarios, only scenario No. 4 had an overall positive net present value.[45]

The cash flow from operating a stock shot library under Scenario No. 4 assumed:

—no transfer of nitrate based film to safety stock;

—no transfer of any footage to video for preservation purposes;

—revenues would be $300,000 in 1982,[46] would increase $140,000 each year until an annual base of $1 million was reached in 1987, and to increase thereafter at 5 percent annually;

—personnel costs would be $66,000 [47] the first year, would increase 20 percent annually to 1987, and thereafter would increase at 5 percent annually;

—advertising and marketing expense would be $10,000, increased at 5 percent annually;

—operational expenses were calculated as 45 percent of revenues in 1982, to decline 2 percent each year until reaching 35 percent of revenues in 1987, and held constant thereafter;

—a reversion value for income after the 10th year, calculated on a constant growth formula, adjusted for inclusion of nitrate stock and discounted to valuation date.[48]

The assumptions in the Spiro report are flawed. The amount of nitrate film stock considered in connection with the scenarios does not follow the facts stipulated. The discounted cash flow estimate for the November 30, 1981, total fair market value does not include any costs relative to nitrate film stock during the 10–year period. This omission is unrealistic. The estimated cash flows were based on actual revenues and expenses reflected in UCLA financial statements for the 1987–90 period. The relevant numbers should reflect information that would have been available to a buyer in 1981.

Because of these flaws, the Spiro report is not a useful determination of the Library's fair market value on the valuation date.

---

The record in this case on the fair market value issue does not disclose a specific amount the adoption of which would be obvious and reasonable beyond question. There is no dispute, however, that plaintiff on the facts is entitled to a deduction under IRC § 170, and that the Library, within the

board meetings.

**44.** The parties stipulated, and the stipulation was accepted, that the nitrate based film was 37.66 percent (10,212,460 feet) of the Library footage.

**45.** The DCF analyses showed Scenario No. 1 had a negative total present value of ($3,237,034); Scenario No. 2 had a negative present value of ($1,097,043); and Scenario No. 3 had a negative present value of ($781,271).

**46.** This amount was based on UCLA's licensing revenues in 1986 of $343,632 and Hearst's 1980 revenues of approximately $160,000.

**47.** This amount was derived from an examination of UCLA's experience from July 1, 1986, through Sept. 30, 1989, which indicated personnel expense averaged 22 percent of revenues in that period.

**48.** The present value of the reversion as of Nov. 30, 1981, was $184,848.

scope defined by the regulations,[49] has a fair market value in some amount.

The IRS has recognized and allowed $1,874,844, and, after audit in 1985, apparently recognized $2,026,788 would be allowable as a fair market value. Plaintiff's experts' reports do not show that the correct fair market value is $35,066,956, under a market approach analysis, or that the correct fair market value is $22,926,242, under an income approach analysis. Defendant's expert did not show that the fair market value was either $1,350,194 or $1,860,335, under an income approach analysis.

One source of difficulty is a failure to recognize how the materials that comprise the Library shape the way it can be used. Ninety-eight percent of the 21.4 million feet of unreleased film in the Library consists of cuts that had been edited out of released news stories, or of vault material never used in any news story. All of this film material was limited to times, persons, or places related to particular historical news events. Organization and storage was haphazard and its elements could be located only through a card index system. The film footage had no utility without examination, selection, and rearrangement. It could not be used by simply taking and running footage as it emerged from the storage cans. As a consequence, it could only be used by a prospective purchaser as a source of footage for particularized selection, no matter what market the owner desired to exploit. There is no assurance that the entire footage could be so used, and it is highly unlikely that a use could be found for all of the cuts and vault material in either the 10–year period of the Spiro report, or the 15–year period of the Grabowski report.

The IRS allowance of $1,847,844 amounts to $0.07 a foot, which, when applied to the footage of the cuts and vault material, is an allowance of $1,461,950 as the value of that material. On the record such amount is not clearly unreasonable. Further, even if the per foot value of $0.63 calculated in the Grabowski report is applied to the IRS allowance, it would pay for 2,933,086 feet, which is 14 percent of the total 20,885,000 feet of cuts and vault material. A 14 percent usage of this material in the Grabowski report's three markets, over a 15–year period, is not clearly unreasonable.

In 1972, Hearst purchased MGM's position in the newsreel company and at that time placed a book value of $597,849 on the Library. The amount allowed by the IRS is 3.09 times the 1972 book value. Such a ratio is not without merit as a measure of value. It is indicative of how Hearst's Board viewed the property. It qualifies as an element to be considered in estimating a fair market value in 1981.

A deduction for a charitable contribution under IRC § 170, like all deductions, is a matter of legislative grace.[50] The IRS findings are presumptively correct. A plaintiff has the burden of rebutting the presumption of correctness.[51]

A tax refund suit is not a quasi appellate review of an administrative determination. In order to prevail, the taxpayer, in addition to showing the IRS action was arbitrary, capricious, or unreasonable, must prove the correct amount of the tax and resulting overpayment.[52]

*Conclusion*

On the record of this case, plaintiff has not shown that the total amount that the IRS allowed for the contribution of the

**49.** 26 C.F.R. §§ 1.170A–1(c)(1) & (2).

**50.** *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974); *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934).

**51.** *United States v. Janis,* 428 U.S. 433, 440–41, 96 S.Ct. 3021, 3025–26, 49 L.Ed.2d 1046 (1976); *Danville Plywood Corp. v. United States,* 899 F.2d 3, 7–8 (Fed.Cir.1990).

**52.** *Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Eli Lilly & Co. v. United States,* 372 F.2d 990, 997, 178 Ct.Cl. 666 (1967); *see also Merck & Co. v. United States,* 24 Cl.Ct. 73, 79 (1991); *Krapf v. United States,* 17 Cl.Ct. 750, 758–59 (1989), *rev'd,* 977 F.2d 1454 (Fed.Cir.1992).

Library was unreasonable or otherwise unlawful. Further, plaintiff has not shown the fair market value of the Library on December 2, 1981, the date the gift was made to the Regents. Accordingly, plaintiff has not established entitlement to a refund for a charitable contribution during the years in issue. The Clerk is directed to dismiss the complaint. Costs to defendant.

## APPENDIX

The Regents' December 2, 1981, acceptance applies to the following portion of the Library property:

  a. Volumes 1–11 of the Hearst International Library and Volumes 1–3 of the MGM Newsreel (approximately 137,180 feet of film (of which not less than 120,000 feet is nitrate film));

  b. Volumes 1–20 of the Hearst Metrotone Newsreel and News of the Day (approximately 1,635,950 feet of nitrate film);

  c. Cuts and Vault Material relating to Volumes 1–20 of the Hearst Metrotone Newsreel and News of the Day (approximately 7,767,514 feet of nitrate film);

  d. Index Cards (approximately 450,000 cards) and Synopsis Sheets pertaining to the entire Film Library; and

  e. Copyrights pertaining to Volumes 11–20 of the Hearst Metrotone Newsreel and News of the Day.

The Regents' March 8, 1982, acceptance applies to the following portion of the Library property:

  a. Volumes 21–25 of the Hearst News of the Day (approximately 310,856 feet of nitrate or acetate-safety film);

  b. Cuts and Vault Material relating to Volumes 21–25 of the Hearst News of the Day (approximately 3,962,532 feet of nitrate or acetate-safety film); and

  c. Copyrights pertaining to Volumes 21–25 of the Hearst News of the Day.

The Regents' February 5, 1985, letter applies to the following portion of the Library property:

  a. Volumes 26–30 of Hearst sound newsreel (approximately 282,880 feet of acetate-safety film);

  b. Cuts and Vault Material relating to Volumes 26–30 of Hearst sound newsreel (approximately 5,757,944 feet of acetate-safety film); and

  c. Copyrights pertaining to Volumes 26–30 of the Hearst sound newsreel.

The Regents' November 19, 1985, acceptance applies to the following portion of the Library property:

  a. Volumes 31–39 of Hearst sound newsreel, Volumes 7–15 of Telenews TV Daily, and Volumes 5–14 of This Week in Sports (approximately 3,320,061 feet of acetate-safety film);

  b. Cuts and Vault Material relating to Volumes 31–39 of Hearst sound newsreel (approximately 3,397,253 feet of acetate-safety film);

  c. Color stock shot film produced between 1965 and 1978 (approximately 544,877 feet of acetate-safety film); and

  d. Copyrights pertaining to Volumes 31–39 of the Hearst sound newsreel.

| Total Footage | |
| --- | --- |
| December 2, 1981 | 9,540,644 feet |
| March 8, 1982 | 4,273,388 feet |
| February 5, 1985 | 6,040,824 feet |
| November 19, 1985 | 7,262,191 feet |
| Total | 27,117,047 feet |